[Civ. No. 25644. First Dist., Div. One. May 29, 1970.]

PAT FERRARO, Plaintiff and Respondent, v.
PACIFIC FINANCE CORPORATION et al., Defendants and Appellants.

**COUNSEL**

Partridge, O'Connell & Partridge, Frederick J. Woelflen, Todisco & Capriola and Peter J. Capriola for Defendants and Appellants.

Rea, Frasse, Anastasi, Clark & Lewis and William G. Clark for Plaintiff and Respondent.

**OPINION**

**ELKINGTON, J.**—Defendants Pacific Finance Corporation (Pacific) and William Steitz, doing business as Bill Steitz Motor Sales (Steitz), appeal from a judgment in favor of plaintiff Pat Ferraro, entered upon jury verdicts on July 12, 1968, *nunc pro tunc* as of January 31, 1968. The action was brought for damages resulting from the alleged conversion by Pacific and Steitz of Ferraro's automobile.

At an earlier trial the court directed the jury to return a verdict for Ferraro's *compensatory* damages. By the instructions they were also permitted to determine whether *exemplary* damages should be awarded, and if so, the amount. The jury fixed the compensatory damages at $2,812 and awarded exemplary damages of $15,000 against Pacific and $8,000 against Steitz. On Pacific's and Steitz' motions for a new trial, a limited new trial "solely on the issue of the *amount* of punitive damages to be assessed" was granted.

The judgment from which this appeal is taken is based upon the verdict for compensatory damages of $2,812 returned by the first jury, and exem-

plary damages of $25,000 against Pacific and $8,000 against Steitz, returned by the second jury after the limited retrial. ■ Pacific has also appealed from a "judgment" entered August 30, 1967, by the clerk, pursuant to the directions of Code of Civil Procedure section 664, following the first jury's verdicts. The order granting a limited new trial had the effect of vacating the earlier judgment. (*Love* v. *Wolf,* 249 Cal.App.2d 822, 840 [58 Cal.Rptr. 42]; *King* v. *Goldberg,* 159 Cal.App.2d 543, 544 [523 P.2d 1035]; *Universal Film Mfg. Co.* v. *Kerrigan,* 47 Cal.App. 255 [190 P. 475].) Since an appeal obviously cannot lie from a vacated judgment the purported appeal from the "judgment" entered August 30, 1967, must be dismissed.

Appellants' principal contention is that the awards of exemplary damages must be set aside since they were based upon passion and prejudice of the jury.

■ In our inquiry we are bound by the "substantial evidence" rule. This principle holds that when a jury verdict is attacked on the ground that it is not sustained by the evidence the power of an appellate court begins and ends with the determination whether there is any *substantial evidence,* contradicted or uncontradicted, which will support the verdict; when two or more inferences can reasonably be drawn from the facts the reviewing court may not substitute its deductions for those of the trier of fact, here the jury. (See *Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.,* 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805].)

Following the substantial evidence rule we accept the facts in support of the exemplary awards as they were presumably found by the jury.

The trial record discloses the following evidence.

In April 1966 one Howard Bowers bought a 1964 Cadillac automobile from defendant Steitz, a used car dealer. The transaction took the form of a conditional sales contract under which Bowers made a $600 down payment and agreed to pay the balance in monthly installments. The contract was then sold and assigned to defendant Pacific under an agreement providing that Pacific would have "ownership indicia" of the car. In preparing the necessary application for change of ownership with the Motor Vehicle Department, an employee of Steitz neglected to indicate Pacific's security interest in, or "legal ownership" of, the Cadillac. Because of this error, some weeks later the Motor Vehicle Department forwarded to Bowers a negotiable certificate of ownership or "pink slip" of the automobile, which showed him to be the owner and the vehicle to be unencumbered.

■■ Plaintiff Ferraro was the manager of a motel in Santa Clara County. On July 19, 1966, he learned that Bowers, a guest of the motel, had

a Cadillac automobile which he wanted to sell. Ferraro was interested. The "pink slip," designating Bowers as the owner was exhibited. Ferraro examined and drove the car and then offered Bowers $2,700. The offer was accepted and the price was paid. Bowers delivered the endorsed "pink slip" and the automobile to Ferraro on July 20. The transfer as to Ferraro was in all respects bona fide. Ferraro thus became the absolute owner of the Cadillac automobile free of any claim of Steitz or Pacific.[1]

In the meantime Bowers had missed the second installment of the contract then owned by Pacific. Sometime around July 17, 1966, and "prior to July 18," Steitz learned that the "pink slip" had been issued to Bowers. He promptly communicated this information to Pacific. On July 19 or 20 Steitz "checked with the Department of Motor Vehicles and determined that Mr. Bowers had the pink slip issued in his name." He kept Pacific informed. Soon thereafter both Pacific and Steitz learned that the Cadillac was in Ferraro's possession. Then Pacific heard that Bowers had *given* the car to Ferraro. It entered Pacific's mind that Ferraro had purchased the car, but the company decided against making any inquiry of him. On or about July 26 Pacific decided to repossess. The company "got ahold of the ignition number and trunk number so keys could be made so [Pacific] could drive the car away." Decision was reached to pick up the car around 3 o'clock in the morning.

Asked if there was any reason why he didn't check with Ferraro before repossessing the vehicle, Pacific's operations manager (since promoted to branch manager) who directly handled the transaction, replied, "[T]he easiest way is to restore the automobile first and ask questions second to be quite frank, because we get in a lot of trouble with third party people figuring they had a legal right to the car." He then stated that such was "the policy of the company."

Pacific then called upon its professional automobile repossessor to do the job. Upon learning of the state of the car's title this man said, "I would like just to pass this assignment and not get involved. It might cause me some problem." Steitz, aware of Ferraro's ownership, had no intention to pick up the car. When asked to do so by Pacific he declined the undertaking ex-

[1]In California, as is well known to anyone engaged in the business of selling or lending money on the security of automobiles, a prospective purchaser of a motor vehicle without knowledge of any defect of title may rely exclusively on the information disclosed by the statutory certificate of ownership. (See Veh. Code, §§ 4450-4453.) As is stated in *First Nat. Bank of Hays City* v. *Sprigg*, 209 Cal.App.2d 258, 259-260 [25 Cal.Rptr. 838], "California is known as a 'full title' state insofar as registration of motor vehicles is concerned. This means that anyone transacting business with the owner of a motor vehicle can rely upon the title as reflected by the registration certificate, without further inquiry."

cept as Pacific's agent, "because they own the contract, and, in fact, it was their car, as far as [he] was concerned." Pacific accordingly by letter authorized a Steitz employee to pick up "*our* 1964 Cadillac." With the letter he was furnished by Pacific with duplicate keys and a written memorandum giving Ferraro's address, describing him as "owner of motel," and suggesting that the job be done at "3 a.m." The repossession admittedly was for the "account of Pacific," not Steitz.

Ferraro's car was picked up during the night of July 28-29, 1966, and taken to Steitz' lot where it was held subject to Pacific's order. When he discovered his car to be missing, Ferraro notified the police who later informed him that "Pacific Finance Company had repossessed it."

On August 1, 1966, Ferraro's attorney wrote Pacific as follows: "This office represents Patrick F. Ferraro who purchased the above-described automobile on July 20, 1966, from one Howard Bowers. Mr. Bowers had the pink slip to the car in his possession showing him to be the legal owner. On July 28, 1966, Mr. Ferraro found his car missing and reported it stolen. We discovered that your company picked up this car off the street and drove it to Fresno. We are demanding immediate return of this car and giving you an opportunity to avoid litigation. If we are forced to litigate this matter, we will not only seek reimbursement for conversion, but we will ask for exemplary damages for this outlandish act. We suggest you reply immediately."

Pacific's house counsel replied on August 4, 1966, stating: "Your letter of August 1 was handed to me for response. The contract we held in the name of Howard Bowers has been repurchased by the selling dealer and Pacific Finance no longer claims any interest or control over the Cadillac described in the caption. . . . I suggest that you communicate with [the dealer's attorney] to discuss what rights if any your client has to possession of the Cadillac. Incidentally, the selling dealer through its agents repossessed the Cadillac as a result of default on the part of the purchaser Howard Bowers. Do not hestitate to drop me a line if you wish to communicate further with Pacific Finance in this matter."

Pacific's letter of August 4 was misleading and in several respects false. Its writer admitted on the witness stand that he had learned on August 1 that "Mr. Ferraro had actually bought the car" from Bowers. The car's contract had not been "repurchased by the selling dealer" (Steitz). Nor had the "selling dealer" repossessed the Cadillac "through its agents"; the car had in fact been taken by Pacific through *its* agent. And contrary to the letter, Pacific at the time claimed to have, or at least arbitrarily asserted, "an interest or control" over the vehicle.

Ferraro's efforts to obtain the car from Steitz met with a similar lack of success.

On September 13, 1966, the Motor Vehicle Department wrote to Pacific stating: "Since the vehicle has been transferred this now becomes a civil matter and we shall be obliged to issue certificates in the name of Pat Ferraro, unless we receive within 10 days from the date of this letter a Restraining Order issued out of a California or U.S. Court or a request from a law enforcement agency to withhold transfer." Pacific thereupon, on September 15, for the balance due, sold the vehicle's contract back to Steitz. Steitz' status as agent of Pacific was ended and he succeeded to whatever claim of right or possession that company had over the car. Steitz then, by means of a superior court restraining order, prevented issuance of a "pink slip" to Ferraro. Some weeks later, Steitz as "attorney in fact" applied for a duplicate "pink slip" falsely certifying that the original in Bowers' name had been "lost, stolen, mutilated or is illegible." Steitz explained at the trial that he did so "because the other ownership certificate was locked up in litigation." Under circumstances not clear from the record the Motor Vehicle Department, although holding the original "pink slip" in Bowers' name, issued the duplicate "pink slip."[2] Steitz then located Bowers, somehow obtained his signature to the duplicate "pink slip," and thereupon sold the Cadillac to some third party.

It is worthy of emphasis that at no time during the events we have related, or during the trial, was any contention made by Pacific or Steitz that Ferraro was not an innocent purchaser of Bowers' car for value—or not its owner in fact and in law. It is also noted that responsible officers of Pacific, i.e., its operations manager, its district manager, and its house counsel, participated in the repossession or withholding of the car with knowledge of Ferraro's title.

 The evidence we have related is substantial and to a considerable extent it is uncontroverted. It must be assumed that it was believed and accepted by the jury, and it must be accepted by this court. It discloses a highhanded, tortious, perhaps felonious,[3] taking of Ferraro's property by Pacific and Steitz.

---

[2] No contention was made at the trial, or on this appeal, that Bowers or Steitz or anyone derived any rights as against Ferraro by virtue of the duplicate "pink slip," or the restraining order, or the action in which it was issued.

[3] One who unlawfully takes and carries away the personal property of another, against the owner's will and with intent to permanently deprive the owner of its possession, is guilty of theft. (Pen. Code, § 484; 1 Witkin, Cal. Crimes (1963) pp. 349-360.) If the property is an automobile or of a value exceeding $200 the offense is grand theft, a felony. (Pen. Code, § 487.) Although a criminal act is committed by an agent, his principal who knowingly directed the act is also a party to the offense. (Pen. Code, § 31; 1 Witkin, Cal. Crimes (1963) pp. 49-50.)

■ Without objection a financial statement of Pacific had been admitted in evidence; it showed current assets of over $750,000,000. The jury were invited to consider the financial condition of Pacific "for the purpose of graduating" the amount of their exemplary award. This has long been held to be proper (see *Marriott* v. *Williams,* 152 Cal. 705, 710 [93 P. 875]; *Greenberg* v. *Western Turf Assn.,* 140 Cal. 357, 364 [73 P. 1050]; *McMann* v. *Wadler,* 189 Cal.App.2d 124, 131 [11 Cal.Rptr. 37]; *Bille* v. *Manning,* 94 Cal.App.2d 142, 145 [210 P.2d 254]). ■ "An important factor in determining the propriety of an award for punitive damages is the wealth of the tortfeasor." (*Horn* v. *Guaranty Chevrolet Motors,* 270 Cal. App.2d 477, 484 [75 Cal.Rptr. 871]; *Oakes* v. *McCarthy Co.,* 267 Cal. App.2d 231, 264 [73 Cal.Rptr. 127].)

Pacific strenuously urged, on a petition for rehearing following our initial affirmance of the judgment, that the trial jury and judge, and this court, failed to give proper consideration to the following mitigating circumstances: (1) Pacific advised Steitz to return Ferraro's car when it learned of his ownership, and (2) it telephoned the Motor Vehicle Department the day before the repossession and was told there had been no change in the car's title. We granted the rehearing for the purpose of giving further consideration to these representations.

■ We first discuss Pacific's insistence that after the automobile's repossession it had advised Steitz to return the car to Ferraro. It is noted that this contention is based entirely on self-serving testimony of officers and counsel of Pacific.[4] No relevant writing of any kind was produced and the testimony was not corroborated by Steitz or anyone. And there was otherwise much to discredit the contention.

Pacific's "house counsel" testified that before he wrote the letter of August 4, 1966, (see p. 347, *ante*) to Ferraro's attorney he and the company recognized Ferraro's title and right to the Cadillac and that oral "demand had been made upon the dealer [Steitz] to return the car to Mr. Ferraro." Yet his letter, written while Steitz held the vehicle as Pacific's agent, makes no mention of this; instead it suggests that Ferraro's lawyer discuss with Steitz' attorney "what rights *if any* your client has to possession of the Cadillac." (Italics added.) Furthermore, Pacific itself could have returned the car then or anytime during the next several weeks. Steitz had held possession of the car for Pacific as agent or bailee from the time it had been picked up at Ferraro's motel. And Steitz had no right or claim of right and

---

[4]Pacific has furnished us with a transcript of the testimony and proceedings of the first trial where also the question of exemplary damages was the principal issue. Nowhere in that record do we find a suggestion by testimony or otherwise that Pacific had ever advised Steitz to return Ferraro's car.

asserted no right, to the automobile or its possession as against Pacific; Pacific's trial counsel so conceded when he advised the jury in his argument, "You can only determine Pacific Finance's involvement in this case to the extent of its malicious and wanton misconduct or oppressive action until the date of September 15 when the car was repurchased" by Steitz. And finally, any lingering doubt whether Pacific ordered the car returned must reasonably vanish with a consideration of that company's conduct upon receiving the September 13 Motor Vehicle Department letter stating unless certain steps were taken within 10 days, a new "pink slip" would be issued to Ferraro. Pacific's response, September 15, was to give up control of the car by assigning its contract back to Steitz and receiving full payment therefor. Pacific thus insured that Ferraro would be permanently deprived of his property.

Even if we accept, *arguendo,* Pacific's contention that it orally directed Steitz to return the Cadillac, such was not an unconditional attempt to right the wrong done Ferraro. It must certainly be inferred that such redelivery was conditional on Steitz, under his contract, making good Pacific's loss. Where one has wrongfully and knowingly taken the property of another, an offer to return it upon payment of its value by a third party may not reasonably be deemed a *mitigating* circumstance; instead it would seem to *aggravate* the wrong.

There is also evidence in conflict with Pacific's claim that it decided to repossess only *after* it "learned" through a telephone call on July 27 that Bowers had never been registered as the Cadillac's owner. This claim is sharply contradicted by Pacific's telegram dated July 26 authorizing the professional repossessor to take the car, and the even earlier fabrication of duplicate keys for that purpose. Throughout the record we find evidence that Steitz had learned "for a fact" as early as July 17 from the Motor Vehicle Department that a "pink slip" had been issued to Bowers, and that this information had promptly been furnished Pacific's interested officers. Without contradiction the evidence showed that an automobile purchaser had 10 days within which to apply for a change of ownership registration, and that after such an application 45 to 60 days must be allowed before the change appears on the Motor Vehicle Department's records. For this reason Pacific knew that there could be no available official record on July 27 of the change of title to Ferraro.

Civil Code section 3294 provides "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages *for the sake of example and by way of punishing the defendant.*" (Italics added.)

Exemplary damages are properly awardable in an action for conversion, given the required showing of malice, fraud, or oppression. (*Haigler v. Donnelly,* 18 Cal.2d 674, 681 [117 P.2d 331].) Although such damages "are not a favorite of the law and the granting of them should be done with the greatest caution" (*Gombos* v. *Ashe,* 158 Cal.App.2d 517, 526 [322 P.2d 933]), nevertheless, the determination whether such damages should be awarded, and, if so, the amount, is the exclusive function of the trial jury. It was said in *Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 801 [197 P.2d 713], "A plaintiff, upon establishing his case, is always entitled of right to compensatory damages. But even after establishing a case where punitive damages are permissible, he is never entitled to them. The granting or withholding of the award of punitive damages is wholly within the control of the jury, and may not legally be influenced by any direction of the court that in any case a plaintiff is entitled to them. Upon the clearest proof of malice in fact, it is still the exclusive province of the jury to say whether or not punitive damages shall be awarded. A plaintiff is entitled to such damages only after the jury, in the exercise of its untrammeled discretion, has made the award."

It has been repeatedly held that after a jury award of exemplary damages, it becomes the province of the trial court on motion for new trial to say whether the amount is excessive. (See *Finney* v. *Lockhart,* 35 Cal.2d 161, 164 [217 P.2d 19]; *Zimmerman* v. *Boughton,* 197 Cal.App.2d 842, 847 [18 Cal.Rptr. 119]; *Lawson* v. *Town & Country Shops, Inc.,* 159 Cal.App. 2d 196, 204 [323 P.2d 843].) "After an award has been approved by the trial court the reviewing court will hesitate to declare the amount excessive unless upon consideration of the entire record including the evidence it must be said that the award was the result of passion or prejudice." (*Finney* v. *Lockhart, supra,* p. 164.) Here we note that the trial court on motion for a new trial refused to upset the exemplary awards.

To reach a conclusion that the subject awards of $25,000 and $8,000 resulted from passion or prejudice we must find that each of the 12 jurors (the verdict was unanimous) was so motivated. We must go further and draw the same conclusion with respect to the trial judge, for, as we have pointed out, it was his duty to allow the exemplary awards to stand *only* if they were reasonably supported by evidence.

The jury were properly instructed by the court. They were advised to consider the case without regard to sympathy, prejudice, or passion for or against any party. They were told that where a person has maliciously or wantonly or oppressively, proximately caused injury to another, exemplary damages might be awarded *"to punish the wrongdoer . . . and to serve as an*

*example or warning to others not to engage in such conduct."* (Italics added.) (See Civ. Code, § 3294.)

It appears that the jury could reasonably conclude that Pacific's participation in the wrong "sought to be redressed" was at least equal, certainly not less than, that of Steitz. Supporting such a conclusion are the following considerations.

It is undenied that but for Pacific's importunities, Steitz would *not* have taken Ferraro's automobile. He did so only upon Pacific's authorization and then solely as Pacific's agent and for Pacific's account. The detailed instructions as to Ferraro's address, the car's whereabouts, and the hour of repossession were prepared, and the necessary duplicate keys obtained, by Pacific's manager. When complaint was made by Ferraro, Pacific admittedly knew that he was the owner and entitled to the possession of the vehicle which it had taken. The car at the time was held by Steitz for the "account" of Pacific which owned the Bowers contract. But in its letter Pacific falsely insisted it had resold the car's contract to Steitz and "no longer claimed any interest or control over the Cadillac," and denied any responsibility for its wrongful taking saying that Steitz "through its agents repossessed the Cadillac."

We must presume that the jury disbelieved Pacific's testimony of its oral directions to Steitz to return the car. Even if we were permitted, and wished, to be charitable to Pacific on this question, we would then be obliged to find that the car was ordered returned with the loss to be borne by Steitz. It is inconceivable that Pacific had waived its rights against the dealer which had guaranteed the Bowers contract. Pacific's determination that Ferraro should not recover his property was further demonstrated when the Motor Vehicle Department advised the company of its intent to issue a "pink slip" to Ferraro. Such an official transfer of ownership would certainly have resulted in the delivery of the Cadillac to Ferraro—the very thing that Pacific *now* claims it had for several weeks wanted to do. But instead of allowing the transfer to take its course, Pacific, for the amount then due, transferred the Bowers contract back to Steitz with the results we have heretofore discussed. Thus Pacific intentionally placed beyond its power any ability to correct the wrong it had admittedly done Ferraro. And this whole sorry spectacle of corporate arrogance had its genesis in a policy "to restore the automobile first and ask questions second to be quite frank, because we get in a lot of trouble with third party people figuring they had a legal right to the car."

The difference in amount of the two exemplary awards seems well supported by the evidence and by reason. As indicated, the jury had been told to return such exemplary damage awards against defendants as would "punish the wrongdoer . . . and to serve as an example or warning to others

not to engage in such conduct." Pacific was a large corporation, apparently engaged in financing the automobile buying public at the rate of somewhere between 50,000 and 100,000 cars each year. It had adopted a company policy; whenever in the course of its business some person, rightfully (as here) or otherwise, adversely claimed ownership or a right to possession of a vehicle, the policy required that the car be seized by stealth or by force after which the company would "ask questions." It becomes obvious to any reasonable mind that such a policy must be very profitable. With its alert staff of counsel, repossessors, and other policy enforcers, hundreds, perhaps thousands, of adverse claims which must be made annually are, right or wrong, speedily resolved in Pacific's favor. It is just as obvious that many victims of the policy must be financially unable, or for other reasons reluctant, to cope with Pacific's economic resources and are obliged to relinquish just claims. Such a policy is malicious and oppressive; it is in the public interest that it be curbed.

A jury charged with "punishing the wrongdoer" and establishing an "example or warning to [Pacific, Steitz, and] others not to engage in such conduct" must have speedily recognized that a substantial award was necessary to accomplish that purpose. An amount which would be adequate as to Steitz might well be an acceptable price for Pacific to pay for the continuation of its policy. And it must be remembered that in fixing the awards the jury were told they might *consider the respective financial positions of the defendants.* Here again, no manifestation of passion or prejudice is seen; rather the discerning judgment of a conscientious jury appears.

Defendants, particularly Pacific, point out the "disparate ratio" of actual to exemplary damages in the jury awards.

There is no fixed ratio by which to determine a proper proportion between the two classes of damages; the factors influencing the amount of the exemplary award can only be disclosed by the trial record including a review of the evidence. (*Finney* v. *Lockhart, supra,* 35 Cal.2d 161, 164; *Oakes* v. *McCarthy Co., supra,* 267 Cal.App.2d 231, 263.) Although superficial comparisons are of little value, we observe the relation of actual to exemplary damages approved in the following cases: *Finney* v. *Lockhart, supra,* 35 Cal.2d 161, $1–$2,000; *Scott* v. *Times-Mirror Co.,* 181 Cal. 345 [184 P. 672, 12 A.L.R. 1007], $7,500-$30,000; *Horn* v. *Guaranty Chevrolet Motors, supra,* 270 Cal.App.2d 477, $842-$5,000; *Oakes* v. *McCarthy Co., supra,* 267 Cal.App.2d 231, $14,825-$59,300; *Di Giorgio Fruit Corp.* v. *AFL-CIO,* 215 Cal.App.2d 560 [30 Cal.Rptr. 350], $10,000-$50,000.

In *Scott* v. *Times-Mirror Co., supra,* 181 Cal. 345, the court considered a similar argument of a disproportionate ratio of actual to exemplary dam-

ages. Quoted with approval (p. 367) was the following statement found in *Luther* v. *Shaw,* 157 Wis. 234 [147 N.W. 18]: "Where the jury are properly given such broad discretion with reference to exemplary damages, as indicated by the code of instructions whereby they were told they might assess against the defendant a sum which they deemed just and proper, and best calculated to be an example to him and to others, such jury are entitled to observe these instructions in good faith as meaning just what they say. How, then, can it be said that their verdict is perverse? They disregarded no evidence and violated no instructions in fixing these exemplary damages. Their estimates of what would be sufficient as a punishment and a deterrent and an example was very high as compared with the actual damages assessed and high from any point of view, but it would hardly be candid to invite them in the language of this instruction to fix such sum which expressed their judgment in such matter, and then charge them with bias or perversity because the measure of their abhorrence of defendant's conduct and their judgment of what would be a sufficient punishment and deterrent was represented by a larger sum of money than that which some other man or men would have allowed." (Also cited with approval by *Di Giorgio Fruit Corp.* v. *AFL-CIO, supra,* 215 Cal.App.2d 560, 581.) In *Luther* v. *Shaw, supra,* the ratio of actual to exemplarary damages approved by the court was $150 to $1,500.

The disparity here, in the light of the conduct of defendants is shown by the record before us, does not appear to us to be unreasonable.

Defendants place some reliance on *Luke* v. *Mercantile Accept. Corp.,* 111 Cal.App.2d 431 [244 P.2d 764]. In that case (p. 438) an automobile was erroneously converted with "some basis for holding that defendant[s] exhibited a malicious purpose." When complaint was made the finance company recognized the owner's rights and offered to return the car. Apparently because of that offer, the appellate court considered that "there does not appear to have been any oppression to the detention [as distinguished from the initial conversion] of the car." The court also found that the trial jury had been erroneously instructed on the question of exemplary damages. It was concluded (p. 439): "In view of the erroneous instruction given the jury and the unreasonable proportion borne by the excessive exemplary damages to the actual damages sustained [$2,500 to $580.80 respectively], there should be a retrial of the issue of exemplary damages. . . ."

In *Luke,* when the conduct of their agents was brought home to defendants, they endeavored to rectify the situation. In the case before us both defendants knew Ferraro to be the owner of the subject Cadillac. When Ferraro demanded his property, Pacific at first untruthfully denied any control over the vehicle, and then later, upon being made whole, turned the car over

to Steitz. Although similar demand was made on Steitz, that defendant connived with Bowers to fraudulently secure a duplicate ownership certificate, by virtue of which the wrongful conversion continued, with Ferraro being forever denied his property. Aggravated malice and oppression of a sort not appearing in *Luke* were here found by the jury. Defendants' reliance on *Luke* is misplaced.

We recognize that the exemplary awards here under discussion, at least after payment of all litigation expenses, constitute a windfall to Ferraro. Legal writers have criticized this result, some saying that such awards should be made to the state. But California law is clear; in a proper case "the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294.) Any change must be made by the Legislature, not the courts. The awards in this case were certainly substantial and they did bear a large ratio to the compensatory damages allowed. But even though this court may feel that had it been the trier of fact, such awards, or their amounts, would have been different, we are nevertheless bound by the rule that we may not disturb them unless they appear to have resulted from passion or prejudice. (See *Gruner* v. *Barber,* 207 Cal.App.2d 54, 58 [24 Cal.Rptr. 292].)

In our view the jury appears to have faithfully considered the evidence and followed the trial court's instructions. Their exemplary awards seem to reflect close and reasoned consideration of the evidence, not passion or prejudice against either Pacific or Steitz.

Defendants also contend that the court at the first trial erred in directing a verdict that Ferraro was entitled to compensatory damages. This point may not now be raised on appeal from the judgment following the second trial for reasons we shall now relate.

Code of Civil Procedure section 938 (reenacted 1968 as § 902) provided that "Any party aggrieved may appeal in the cases prescribed in [Code of Civil Procedure § 963 (reenacted 1968 as § 904.1)] . . . ." Section 963 allowed an appeal "From an order granting a new trial. . . ." One who moves for a new trial on all issues and obtains a new trial only on limited issues is an aggrieved party who has a right of appeal from the new trial order. (*Spencer* v. *Nelson,* 30 Cal.2d 162, 164-165 [180 P.2d 886]; *Stegmann* v. *Holder,* 223 Cal.App.2d 531, 537 [36 Cal.Rptr. 1]; *Danielson* v. *Stokes,* 214 Cal.App.2d 234, 237 [29 Cal.Rptr. 489]; *Garcia* v. *San Gabriel Ready Mixt,* 173 Cal.App.2d 355, 357 [343 P.2d 327]; but see *Universal Film Mfg. Co.* v. *Kerrigan, supra,* 47 Cal.App. 255.) Code of Civil Procedure section 956 (reenacted 1968 as § 906) provided: "The provisions of this section do not authorize the court to review any decision or

order from which an appeal might have been taken."[5] Giving effect to section 956, *Woodman* v. *Ackerman,* 249 Cal.App.2d 644, 648 [57 Cal.Rptr. 687], states: "The law of this state does not allow, on an appeal from a judgment, a review of any decision or order from which an appeal might previously have been taken." (See also *Mohn* v. *Tingley,* 191 Cal. 470, 492 [217 P. 733]; *West* v. *Parker,* 97 Cal.App.2d 286, 291 [217 P.2d 473]; *Weber* v. *Marine Cooks' & Stewards' Assn.,* 93 Cal.App.2d 327, 339 [208 P.2d 1009]; *Weygandt* v. *Larson,* 130 Cal.App. 304, 310 [19 P.2d 852].)

It follows that defendants, having failed to appeal from the order granting only a limited new trial, may not now complain that the first trial judge erred in directing a verdict on the issue of compensatory damages.

Finally, defendants contend that the court in the second trial erred in directing the jury that they were to determine only the amount of exemplary damages, and not whether such damages should be allowed. This contention also we find to be without merit.

In the earlier trial, as we have pointed out, the jury returned a verdict against defendants for compensatory and exemplary damages. As to the exemplary damages the verdict had *not* been directed. The new trial being granted on the issue of the *amount* of exemplary damages only, the question *whether* there should be such damages was disposed of by the first jury. And, for the reasons we have indicated, the order granting the limited new trial is now beyond appellate review (see authorities cited, *ante*). Accordingly, it was without error that the court at the second trial instructed that the jury was to determine only the *amount* of exemplary damages.

We find a motion of Ferraro to dismiss defendants' appeal from the judgment entered July 12, 1968, *nunc pro tunc* as of January 31, 1968, to be without merit, and a discussion thereof unnecessary to our disposition of the cause.

The judgment entered on July 12, 1968, *nunc pro tunc* as of January 31, 1968, is affirmed; the motion to dismiss the appeal from that judgment

---

[5]The full text of section 956 follows: "Upon an appeal from a judgment the court may review the verdict or decision, and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment, or which substantially affects the rights of a party. The court may also on such appeal review any order on motion for a new trial. The respondent, or party in whose favor the judgment was given, may, without appealing from such judgment, request the court to and it may review any of the foregoing matters for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken. The provisions of this section do not authorize the court to review any decision or order from which an appeal might have been taken."

is denied. The appeal from the "judgment" entered August 30, 1967, is dismissed.

**MOLINARI, P. J.**—I concur in the decision reached by my colleague Justice Elkington and in the rationale of his decision, excepting that I do not subscribe to the suggestion that the repossession of the vehicle may have been felonious or to the suggestion that the course of conduct employed in this case by Pacific Finance Corporation is pursuant to a company policy of repossessing cars which it has no right to repossess. In this case both Pacific and the dealer Steitz acted maliciously and oppressively. With particular regard to Pacific's conduct I am satisfied that the record supports the inference that, as between Pacific and Steitz, the former, as the assignee and owner of the conditional sales contract under which the vehicle was sold, had it within its power to compel Steitz, who was Pacific's agent in the repossession, to return the vehicle to plaintiff Ferraro, at least up to the time Pacific sold the contract back to Steitz. In my opinion Pacific was not justified in reselling the contract to Steitz under the circumstances. Under the "Repurchase Agreement" executed as part of the assignment from Steitz to Pacific the former agreed to pay the latter the unpaid balance under the contract upon demand of Pacific *if Pacific repossessed or recovered the vehicle,* provided the vehicle was tendered to Steitz by Pacific within a specified period. Here the record is bereft of any such demand by Pacific, but more important, the repurchase agreement contemplates a valid repossession and recovery by Pacific. Here, assuming that Pacific did make the subject demand, it acted oppressively when, knowing or having reason to believe, that it did not have the right to repossess as against an innocent purchaser, it assigned its rights to the vehicle back to Steitz.

Although the award against Pacific is high in relation to the actual damages sustained by Ferraro, I do not consider it so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice. As indicated in the opinion of Justice Elkington the purpose of an award of exemplary damages is solely to punish the defendant and to make an example of him. The object of exemplary damages is to make the example as well as the punishment fit the offense (*Thomson* v. *Catalina,* 205 Cal. 402, 405-406 [271 P. 198]), and in determining the amount necessary to impose the appropriate punitive effect the jury was entitled to consider the wealth of Pacific. (*Marriott* v. *Williams,* 152 Cal. 705, 710 [93 P. 875]; *Oakes* v. *McCarthy Co.,* 267 Cal.App.2d 231, 264 [73 Cal.Rptr. 127]; *Di Giorgio Fruit Corp.* v. *AFL-CIO,* 215 Cal.App.2d 560, 581 [30 Cal.Rptr. 350]; *MacDonald* v. *Joslyn,* 275 Cal.App.2d 282, 293 [79 Cal.

Rptr. 707]; Rest., Torts, § 908.) Here in the present case the jury measured the punishment in the light of the evidence indicating Pacific's ability to respond to the award (see *Coy* v. *Superior Court,* 58 Cal.2d 210, 223 [23 Cal.Rptr. 393, 373 P.2d 457, 9 A.L.R.3d 678]), and in doing so made the example as well as the punishment fit the offense. If Pacific has in fact persisted in the type of conduct disclosed in this case the award of exemplary damages in the substantial sum of $25,000 should serve to act as a deterrent against its repetition.

**SIMS, J.**—I dissent.—The award of $25,000 against Pacific Finance Corporation shocks my conscience (see *Cunningham* v. *Simpson* (1969) 1 Cal.3d 301, 308-309 [81 Cal.Rptr. 855, 461 P.2d 39]) because as I view the evidence the defendant did not act to prevent the restoration of the automobile to its rightful owner after the second purchaser demanded its return. Although there was no formal reassignment or repurchase of the contract by the dealer until September 15, 1966, it was obvious, from the relationship of the parties and the failure of the dealer to furnish the indicia of ownership, that the dealer was liable to the lender for the original purchaser's contract balance. Under these circumstances the dealer, as between himself and the lender, was entitled to the security on satisfying that liability. (Civ. Code, § 2849.) It was the dealer, not the lender, who retained and refused to return the car after August 4, 1966. The subsequent transfer of the contract back to the dealer merely evidenced the relationship which existed and recognized the dealer's right to the security, as against the lender whom he was bound to indemnify. The fact that this transfer enabled the dealer to further litigate the matter of ownership, does not indicate that the lender encouraged or joined in the dealer's retention and ultimate disposition of the automobile. Although the lender could waive its own interest in the automobile, it could not release the rights which the dealer had, in what had been intended to be the security for the performance of the original purchaser's loan, without forfeiting its rights against the dealer. (Civ. Code, §§ 2819, 2849 and 2854.) It had no choice other than to leave the determination of the validity of the transfer from Bowers to Ferraro to the dealer.

Under these circumstances I would grant a new trial as to the defendant Pacific unless the plaintiff consented to a remittitur to $8,000 against that defendant. (See *Luke* v. *Mercantile Accept. Corp.* (1952) 111 Cal.App.2d 431 [244 P.2d 764].)