[S.F. No. 24763. Dec. 5, 1985.]

T & O MOBILE HOMES, INC., Plaintiff and Appellant, v.
UNITED CALIFORNIA BANK, Defendant and Respondent.

442

444

COUNSEL

Marshall W. Krause, Richard M. Grant, Krause, Timan, Baskin, Shell & Grant and T. W. Salter for Plaintiff and Appellant.

Cook, Perkiss & Liehe, David J. Cook, Ross, Ivanjack & Alborg, Kenneth P. Gray and Thomas E. Alborg for Defendant and Respondent.

**OPINION**

**BIRD, C. J.**—Who should bear the loss when a bona fide purchaser relies on a vehicle certificate of ownership which fails to disclose that the vehicle is subject to a perfected security interest?

I.

On July 27, 1979, Shirl and Edward E. Morgan obtained from defendant, United California Bank (UCB),[1] a personal loan for $17,146 to finance the purchase of a mobilehome. The Morgans granted UCB a security interest in the mobilehome to secure repayment of the loan.

On August 6, 1979, UCB mailed to the Department of Motor Vehicles (DMV) a request for issuance of a new certificate of ownership showing UCB as the legal owner. The necessary fees and the existing certificate, properly endorsed by the Morgans, were enclosed. That day or soon thereafter, bank personnel made an entry in a UCB computer to remind them in 90 days to confirm that the DMV had issued an accurate certificate of ownership.

On October 15, 1979, the DMV issued a certificate of ownership showing the Morgans as the registered owners of the mobilehome. Although UCB had properly requested issuance of a certificate showing it as the legal owner, the space reserved for the "lienholder" and "legal owner" was mistakenly left blank. Thus, the certificate did not disclose UCB's interest.

On November 20, 1979, Shirl Morgan offered to sell the mobilehome to plaintiff, T & O Mobile Homes, Inc. (T&O), a dealer in used mobilehomes.

---

[1]After this lawsuit was filed, defendant changed its name to First Interstate Bank of California. Defendant's motion to have its change of name noted in the proceeding was granted, but the caption was never changed.

She did not inform T&O that UCB was the legal owner. Relying on the "clean" certificate of ownership, T&O purchased the mobilehome for $7,000 cash. Shirl Morgan endorsed the certificate and delivered it to T&O.

T&O's status as a bona fide purchaser was undisputed. The parties stipulated that T&O had no actual notice of the existence of UCB's security interest when it purchased the mobilehome. It was also stipulated that T&O would not have made the purchase had it known of UCB's security interest.

On December 6, 1979, the DMV sent a letter to the Morgans, with copies to T&O and UCB, which stated that the October 15th certificate of ownership had been incorrectly issued and was invalid. The letter indicated that a new certificate would be issued listing UCB as the legal owner. The new certificate was issued to UCB on December 21, 1979.

After UCB demanded possession of the mobilehome, T&O brought an action against UCB.[2] T&O sought a judgment declaring it the legal owner and enjoining UCB from repossessing the mobilehome. A court trial was held. The court found that UCB's security interest had been perfected and was prior to the interest of T&O. Judgment was entered declaring UCB the legal owner. T&O appeals that judgment.

## II.

Division 9 (§§ 9101-9508) of the California Uniform Commercial Code "sets out a comprehensive scheme for the regulation of security interests in personal property." (Official com. to Cal. U. Com. Code, § 9101.)[3] Section 9201 provides that, except as provided otherwise by the Code, "a security agreement is effective according to its terms between the parties, *against purchasers of the collateral* and against creditors." (Italics added.)[4]

---

[2]The DMV was named as a defendant in a separate complaint which was consolidated with this action. After a hearing, the trial court granted the DMV's motion for summary judgment. Neither party appeals from that order.

[3]All statutory references are to the California Uniform Commercial Code unless otherwise noted. In the interest of brevity, references to this code in the text will be to the UCC or the Code.

[4]A security interest continues after a sale of the collateral unless the secured party consented to the sale. Subdivision (2) of section 9306 provides in relevant part: "Except where this division [9] . . . otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise . . . ." The former version of subdivision (2) in effect in 1979, when the transactions in this case occurred, differed in minor respects not significant here. (See Stats. 1963, ch. 819, § 9306, p. 1981.) T&O does not contend that UCB authorized the sale.

A security interest attaches and becomes enforceable when (1) either the debtor has signed a security agreement or the secured party is in possession of the collateral, (2) value has been given, and (3) the debtor has rights in the collateral. (§ 9203.) These conditions were satisfied on July 27, 1979, when the Morgans signed the security agreement and received the loan proceeds.

To be effective against a purchaser of the collateral, a security interest in goods must also have been "perfected" prior to the purchase. ■ ■■■ ■ An unperfected security interest is subordinate to the rights of "a person who is not a secured party and who is a . . . buyer not in ordinary course of business to the extent that he gives value and receives delivery of the collateral without knowledge of the security interest and before it is perfected." (§ 9301, subd. (1)(c).)[5]

For most kinds of goods, a security interest is perfected when it has attached and a financing statement has been filed in the office of the Secretary of State. (See §§ 9303, 9401.) However, the filing provisions of the UCC are not applicable to noninventory mobilehomes. (See § 9302, subd. (3)(b).)[6] At the time of the transactions at issue here, perfection of a security

---

[5]A "buyer in ordinary course" is defined as "a person who in good faith and without knowledge that the sale to him or her is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. . . ." (§ 1201, subd. (9).) A fortiori, a buyer *not* in ordinary course includes one who buys from a person who is not in the business of selling the type of goods purchased. The Morgans are not in the business of selling mobilehomes. Therefore, T&O, although it purchased the mobilehome from them in good faith and without knowledge that the sale violated UCB's security interest, was not "a buyer in ordinary course."

The distinction can be important. A buyer in ordinary course of business "takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." (§ 9307, subd. (1).) This provision was intended to "protect the ordinary customer of a retail or wholesale merchant who has created a lien upon his inventory." (*The Uniform Commercial Code: A Special Report by the California State Bar Committee on the Commercial Code* (1962) 37 State Bar J. 117, 213.)

[6]In 1979, this provision read as follows: "(3) The filing of a financing statement otherwise required by this division is not necessary or effective to perfect a security interest in property subject to . . . [¶] (b) The provisions of the Vehicle Code which require registration of a vehicle or boat; but during any period in which collateral is inventory, the filing provisions of this division (Chapter 4) apply to a security interest in that collateral . . . ." (Former § 9302, subd. (3)(b), Stats. 1975, ch. 650, § 1, p. 1408.) The registration provisions of the Vehicle Code were made applicable to mobilehomes by Vehicle Code section 5350. (See also Veh. Code, § 635; but see *id.*, § 5351.)

Mobilehome registration is no longer governed by the Vehicle Code or administered by the DMV. In 1981, the sentence making mobilehomes subject to the registration provisions of the Vehicle Code was deleted from Vehicle Code section 5350. (Stats. 1981, ch. 975, § 35, p. 3796.) Subdivision (3)(b) of section 9302 of the UCC was amended to exclude from the coverage of the Code's filing provisions noninventory property subject to the "provisions

interest in a noninventory mobilehome was governed exclusively by the provisions of section 6301 of the Vehicle Code. That section provides that "[w]hen the secured party, his or her successor, or his or her assignee, has deposited with the department a properly endorsed certificate of ownership showing the secured party as legal owner or an application in usual form for an original registration, together with an application for registration of the secured party as legal owner, the deposit constitutes perfection of the security interest and the rights of all persons in the vehicle shall be subject to the provisions of the Uniform Commercial Code . . . ."[7] (See also Veh. Code, § 6303.)

As previously noted, the UCC provides that a perfected security interest is generally effective against a purchaser of the collateral. (See §§ 9201, 9301, subd. (1)(c), but see § 9307, subd. (1).) This rule is premised upon the assumption that the filing of a financing statement with the Secretary of State will permit prospective purchasers and encumbrancers to ascertain the existence of security interests in the property by checking a centralized record system. In other words, the UCC's perfection system, like the title recordation systems employed for real property, is based on constructive notice given through recordation. (See Note, *Security Interests in Motor Vehicles Under the UCC: A New Chassis for Certificate of Title Legislation* (1961) 70 Yale L.J. 995, 1005 [hereafter *Security Interests in Motor Vehicles*].)

By contrast, the special scheme employed for the registration of security interests in motor vehicles relies primarily on *actual* notice to subsequent purchasers through a certificate of ownership held by the seller. (See *Security Interests in Motor Vehicles, ibid.;* Comment, *The California Used Car Dealer and the Foreign Lien—A Study in the Conflict of Laws* (1959) 47 Cal.L.Rev. 543, 546-547.) Because this "full title" system requires all security interests to be listed on the statutory certificate of ownership (see Veh. Code, §§ 370, 4451, 4453), a purchaser may rely on the certificate

---

of the Health and Safety Code which require registration of a mobilehome or commercial coach . . . ." (Stats. 1981, ch. 134, § 7, p. 912.) On July 1, 1981, the Mobilehomes— Manufactured Housing Act of 1980 went into effect. (Health & Saf. Code, § 18000 et seq.) Responsibility for registration of mobilehomes was shifted to the jurisdiction of the Department of Housing and Community Development. (*Id.*, § 18075, subd. (a).) The impact of these statutory changes on the present case is discussed *post*, at pages 454-455.

[7]The former version of Vehicle Code section 6301 in effect in 1979 differed in minor respects not significant here. (See Stats. 1963, ch. 819, § 49, p. 2014; Stats. 1982, ch. 454, § 182, p. 1893.)

and is not expected to check a centralized set of records to determine whether a security interest has been recorded.[8]

California adopted the full title system decades before the advent of the UCC, and the system remains essentially unchanged. The buyer's right to rely on the information on the certificate of ownership has been emphasized by our courts both before and after the enactment of the UCC. In *First National Bank of Hays City* v. *Sprigg* (1962) 209 Cal.App.2d 258 [25 Cal.Rptr. 838], decided one year before the enactment of the UCC, the court observed that "California is known as a 'full title' state insofar as registration of motor vehicles is concerned. This means that anyone transacting business with the owner of a motor vehicle can rely upon the title as reflected by the registration certificate, without further inquiry." (*Id.*, at pp. 259-260.)

*Ferraro* v. *Pacific Finance Corp.* (1970) 8 Cal.App.3d 339 [87 Cal.Rptr. 226], decided seven years after adoption of the UCC, reached the same conclusion. "In California, as is well known to anyone engaged in the business of selling or lending money on the security of automobiles, a prospective purchaser of a motor vehicle without knowledge of any defect of title may rely exclusively on the information disclosed by the statutory certificate of ownership." (*Id.*, at p. 346, fn. 1.)

Like full title statutes in other states, Vehicle Code section 6301 holds a purchaser to constructive notice of a security interest from the time the secured party's application for registration as legal owner is deposited with the DMV. (See Veh. Code, §§ 6301, 6302; *Security Interests in Motor Vehicles, op. cit. supra,* at p. 1005.) However, the purpose of this provision is primarily to establish priority among two or more competing *lienholders* according to time of receipt of the applications. (See *ibid.*) The deposit of the application is deemed to impart constructive notice only because it is assumed that the security interest will actually be recorded in the DMV's files. (See *Eckhardt* v. *Morley* (1934) 220 Cal. 229, 230-231 [30 P.2d 423].) In *Eckhardt,* this court construed the predecessor to Vehicle Code section 6301 to require actual registration before constructive notice would be deemed to *date* from the time of deposit. (*Ibid.*)

---

[8]The dissent maintains that this case is like any other involving a mistake in the filing or indexing of a security interest subject to the UCC. (See dis. opn., *post,* at p. 457.) However, none of the authorities cited by the dissent addresses the problem presented when an actual notice system based on a certificate of ownership is superimposed on the general purpose, constructive notice model of the UCC. The dissent would afford the certificate of ownership no legal significance whatsoever. That view ignores the pivotal role assigned to the certificate by the Vehicle Code, by the courts, and by millions of lay persons who rely on it when they buy used motor vehicles.

The same reasoning applies to the requirement for notation of the security interest on the certificate of ownership. Upon registration, the DMV is required to issue a new certificate of ownership to the legal owner listing the legal owner's name and address. (See Veh. Code, §§ 1800, subd. (a), 4450, 4451, 4453, 6302.) Thus, it is assumed that the deposit of an application for registration will result in simultaneous registration of the security interest and issuance of a new certificate of ownership listing the secured party as the legal owner. The deposit should not be deemed to impart constructive notice to a buyer unless the security interest has been accurately listed on the certificate of ownership.

When the system functions properly, there will be no unfairness to purchasers and no opportunity for conflicting results in title disputes. The result should be the same regardless of whether reliance is placed on the constructive notice provided by the central DMV records or the actual notice provided by the certificate of ownership. A security interest cannot be recorded while a certificate of ownership for the vehicle is at large. The DMV will register a security interest only when the existing certificate, properly endorsed, is submitted with the application. (See Veh. Code, § 6301.) Conversely, a new certificate of ownership listing the security interest will be issued only in conjunction with registration of the security interest. (See Veh. Code, §§ 4450, 6301, 6302.)[9]

Thus, it should normally be impossible for a seller to present a buyer with a certificate of ownership which shows no security interest at a time when the DMV records show one. By the same token, a prospective buyer has no

---

[9]The dissent contends that today's holding ignores the effect of the "inevitable delay in indexing." (Dis. opn., *post,* at p. 457.) In fact, delays in indexing are not a concern for the buyer under the full title system since the system relies primarily on the notice provided by the certificate of ownership and not on indexes. As noted above, the current certificate of ownership must be submitted with any application for registration of a security interest. A new certificate will be issued only when the security interest has been registered and indexed. Absent DMV error, it will normally be impossible in the period of "inevitable delay" between filing and indexing for the seller to present—or the buyer to rely on—a certificate of ownership that does not reveal the security interest.

For the buyer of an item that is subject to a pure constructive notice system, the delay between filing and indexing of a security interest poses a danger even in the absence of mistakes by the filing officer. The UCC alerts such a buyer that he or she takes subject to recently filed security interests that may not appear in a search of the appropriate index. (See §§ 9303, 9401.) The delay in indexing is not a problem for the buyer of a motor vehicle governed by the Vehicle Code's full title system precisely because the system directs the buyer to rely primarily on the certificate of ownership and not on the DMV's central records.

It is apparently necessary to reiterate that this case arose not from an error or delay in filing or indexing but from an error in the preparation of a certificate of ownership. By its repeated attempts to portray the issue as one of improper filing or indexing (dis. opn., *post,* at p. 457), the dissent demonstrates either an inability or a stubborn refusal to recognize the function of the certificate of ownership.

reason to check the DMV's records if the seller produces a clean certificate of ownership. (See *Ferraro* v. *Pacific Fin. Corp., supra,* 8 Cal.App.3d at p. 346, fn. 1; *First Nat. Bank of Hays City* v. *Sprigg, supra,* 209 Cal.App.2d at pp. 259-260.) The DMV records and the provision for constructive notice based on registration should come into play only when the seller is unable to produce a certificate of ownership. A buyer who proceeds in that situation without checking the DMV records does so at his or her own risk.

In this case, of course, the system did not function properly. Although UCB deposited an application in proper form which requested registration of its security interest and issuance of a certificate of ownership listing it as legal owner of the mobilehome, the DMV mistakenly issued a certificate which listed no legal owner.[10] Relying on the "clean" certificate, T&O paid $7,000 to purchase the mobilehome from the Morgans, who have since disappeared from the scene. ■ ■ ■ ■ The question then becomes who should bear the loss, the bona fide purchaser or the bank with the perfected security interest?[11]

■ The specific provisions of the UCC governing the effect of a perfected security interest on subsequent purchasers do not provide an answer. As an early UCC commentator noted, dating perfection from the time of deposit prevents the second of two applications received by the recording agency from being listed on the certificate and recorded as the first. (See *Security Interests in Motor Vehicles, op. cit. supra,* at p. 1005.) Thus, finding constructive notice from the time of deposit provides a fair means of resolving questions of priority between competing secured parties. However, it does not address or solve the problem created for a subsequent buyer

---

[10]The record does not disclose whether UCB's security interest was properly entered into the DMV's indexed records. (See Veh. Code, § 1800, subd. (a).) Under the Vehicle Code, an application for registration is filed separately from the corresponding record of registration, which is indexed under several categories. (See *ibid.*) As a result, it is possible that the record of registration for the subject mobilehome, like the erroneous certificate of ownership, omitted UCB's security interest.

UCB failed to obtain or introduce into evidence any of the DMV's records. It chose to rely on the department's letters informing the parties of the mistake as proof that its application for registration had been received.

[11]The speculations of the dissent regarding "guilty knowledge" notwithstanding, the parties did stipulate that T&O had no actual knowledge of UCB's security interest. (See dis. opn., *post,* fn. 2.) This court may not go behind that stipulation to question T&O's bona fides. (See 1 Witkin, Cal. Procedure (3d ed. 1985) Attorneys, § 208, pp. 239-240 and cases cited [stipulation, unless contrary to law, court rule or policy, is binding on court]; see also *Schlemmer* v. *Provident Life & Acc. Ins. Co.* (9th Cir. 1965) 349 F.2d 682, 684 ["When parties have entered into stipulations as to material facts, our duty is to treat such facts as having been established by the clearest proof"].) Certainly it would be unwise to indulge such speculations in formulating a rule of general application.

or secured party when no interest is noted on the certificate at all. (See *id.,* at pp. 1005-1006.)

■■■ Where the Legislature has failed to anticipate a problem, the UCC provides for the application of common law and equitable principles. "Unless displaced by the particular provisions of this code, the principles of law and equity . . . shall supplement its provisions." (§ 1103.)

To identify the relevant principles, it is useful to consider cases which have construed provisions for constructive notice in statutes governing the recordation of interests in real property. *Cady* v. *Purser* (1901) 131 Cal. 552 [63 P. 844] concerned the question of which party should prevail when a county recorder fails to record a mortgagee's interest and the land is subsequently sold to a bona fide purchaser. In holding for the subsequent purchaser, this court treated the recorder as the agent of the mortgagee, attributing any errors or omissions by the recorder to the mortgagee. (*Id.,* at p. 556; see *Dougery* v. *Bettencourt* (1931) 214 Cal. 455, 461-465 [6 P.2d 499]; *Watkins* v. *Wilhoit* (1894) 104 Cal. 395, 399 [38 P. 53].)

In *Eckhardt* v. *Morley, supra,* 220 Cal. 229, this court held that the requirements for effective constructive notice of interests in real property were equally applicable to security interests in motor vehicles under the predecessor to Vehicle Code section 6301. (*Id.,* at p. 231.) After reviewing statutes and cases concerning real property recordation, the court concluded that, while recordation may be deemed effective for some purposes on deposit, "wherever the purpose of the recordation is to give constructive notice of the contents of the instrument, the mere deposit of it with the recorder is not the equivalent of recordation." (*Ibid.*)

Responsibility for insuring that the security interest is actually recorded and listed on the certificate of ownership is properly placed on the lender as the party seeking the protection offered by recordation. The lender, who knows that it has applied for registration of the security interest, is also in a better position than a subsequent purchaser to detect and correct an error. For example, in this case UCB's computer was programmed to remind bank personnel to determine whether the DMV had issued a certificate of ownership listing UCB's security interest. A witness for the bank testified that the computer could have been programmed to call for the confirmation earlier. This step could well have led to discovery of the error before the sale to T&O.[12]

---

[12]T&O cites cases holding that "where one of two innocent persons must suffer because of the conduct of a third person, the loss must be borne by the person whose negligence or

UCB argues that T&O was not entitled to rely on the certificate of ownership and could have protected itself by checking the records of the DMV to determine whether a security interest in the mobilehome had been registered. However, the record does not establish that the bank's interest had been registered. (See *ante,* fn. 10.) For all the record discloses, a check of the DMV's indexed records would have produced nothing but the same inaccurate information which appeared on the certificate of ownership. Only by retrieving the original application could a buyer confirm the accuracy of the information appearing on the certificate. More importantly, the argument ignores the established principle that permits a buyer to rely exclusively on the information appearing on the certificate. (*Ferraro* v. *Pacific Fin. Corp.,* supra, 8 Cal.App.3d at p. 346, fn. 1; *First Nat. Bank of Hays City* v. *Sprigg, supra,* 209 Cal.App.2d at pp. 259-260.)

UCB also argues that its security interest must prevail because "T&O at no time moved to perfect its title in the subject property." UCB invokes a "general rule of property law . . . that, to prevail over other claims to the same property, one must first record or file his interest."

In support of this dubious proposition, UCB relies on section 5600 of the Vehicle Code, which requires a transferee of title in a registered vehicle to apply for transfer of the registration before the transfer will be effective. This reliance is misplaced. UCB fails to note that subdivision (a) of Vehicle Code section 5600, by reference to Vehicle Code section 5906, expressly exempts a dealer holding a vehicle for resale from the registration requirement. T&O, as a dealer in used mobilehomes, clearly came within the exemption.[13]

---

misplaced confidence enabled the injury to occur." (*Tampico* v. *Wood* (1963) 222 Cal.App.2d 211, 214-215 [34 Cal.Rptr. 885]; accord *People's Finance etc. Co.* v. *Bowman* (1943) 58 Cal.App.2d 729, 736 [137 P.2d 729]; see Civ. Code, § 3543.) According to T&O, the bank misplaced its confidence in the Morgans when it extended credit to them, making it possible for the Morgans to defraud T&O.

This argument is unpersuasive. One could as easily conclude that T&O "misplaced its confidence" in the Morgans when it bought the mobilehome from them. (See Vold, *Worthless Check Cash Sales, "Substantially Simultaneous" and Conflicting Analogies* (1950) 1 Hastings L.J. 111, 121-123.) The argument also misses the point. The problem in this case arose as a result of the conduct of the DMV. The Morgans could never have presented T&O with a clean certificate of ownership if the DMV had not mistakenly issued it. The real question is who should bear the cost of that mistake.

[13]The dissent finds a dilemma where none exists, suggesting that the rule applied here shields dealers but leaves consumers unprotected. (Dis. opn., *post,* fn. 7.) T&O did not apply for transfer of the registration precisely because it knew that, under the dealer exemption, the transfer of title would be effective without registration. As for consumers, the registration card which must be ̀kept in every licensed motor vehicle clearly states the requirement to notify the DMV immediately when the vehicle is sold.

Finally, UCB asserts that T&O claims the status of a holder in due course and regards the certificate of ownership as a negotiable instrument. T&O makes no such claims, which would in any event be unsupportable under the definition of the term "negotiable instrument" in the UCC. (See § 3104, subd. (1); see also § 1201, subd. (15), § 7104.)

In conclusion, an examination of the general perfection provisions of the UCC and the special "full title" registration scheme for security interests in motor vehicles supports the position advanced by T&O. The interest of a bona fide purchaser must prevail over a technically perfected security interest which is not disclosed on the vehicle certificate of ownership.

▮ Because the transactions involving the mobilehome occurred in 1979, this case is subject to the rules applicable to a motor vehicle. The parties incorrectly assume that the same result would obtain if the transactions had occurred, for example, within the past year. However, in 1981 the Legislature enacted the Mobilehomes—Manufactured Housing Act of 1980, which created a completely separate system for the registration of mobilehomes. (Health & Saf. Code, § 18000 et seq., id., § 18075, subd. (a); see ante, fn. 6.) Registration of mobilehomes is now conducted by the Department of Housing and Community Development rather than the DMV.

Many of the new provisions are quite similar to the comparable sections of the Vehicle Code which remain applicable to motor vehicles. Following recent amendments, the Health and Safety Code provides for the establishment of a "permanent title record" and the issuance of a "certificate of title," both of which are to contain up-to-date listings of all security interests in the mobilehome. (See Health & Saf. Code, §§ 18090.5, 18091, 18100.5, subd. (a)(1).) These requirements are similar to those found in the Vehicle Code provisions discussed above. (See Veh. Code, §§ 1800, subd. (a), 4450, 4451, 4453, 6302.)

Other provisions represent a significant shift in philosophy. Particularly relevant here is Health and Safety Code section 18091, which sets forth the information that must appear on the mobilehome "certificate of title." Most of the information is similar to that required on a motor vehicle certificate of ownership under Vehicle Code section 4451. However, the mobilehome certificate of title must also contain "[a] statement to the effect that the certificate of title may not reflect all liens filed with the department against the title and that current title status may be confirmed through the department." (Health & Saf. Code, § 18091, subd. (d).) No comparable statement is required on a motor vehicle certificate of ownership. (See Veh. Code, §§ 4450, 4451, 4453.)

It thus appears that a different result would be compelled if the transactions in this case had occurred after July 1, 1981, when the new statutory scheme for mobilehome registration took effect. The disclaimer required on the new certificate of title warns the prospective purchaser of a mobilehome against relying, as T&O did here, on the certificate. The Legislature appears to have concluded, at least with respect to mobilehomes, that a buyer's examination of a certificate cannot substitute for a complete search of the centralized recording system.

 This comparison of the two statutory schemes reinforces the foregoing interpretation of the UCC and Vehicle Code provisions applicable to this case. It is apparent that, when the Legislature wants to discourage reliance by buyers on a certification system, it knows how to say so. The fact that the Legislature left the parallel Vehicle Code sections unchanged provides a strong indication that it concurred in the established rule that buyers of motor vehicles may rely exclusively on the information contained in the certificate of ownership. (See *People* v. *Drake* (1977) 19 Cal.3d 749, 755 [139 Cal.Rptr. 720, 566 P.2d 622]; *City of Port Hueneme* v. *City of Oxnard* (1959) 52 Cal.2d 385, 395 [341 P.2d 318]; *Fair* v. *Fountain Valley School Dist.* (1979) 90 Cal.App.3d 180, 187-188 [153 Cal.Rptr. 56].)

### III.

The interest of a bona fide purchaser of a vehicle subject to registration under the Vehicle Code prevails over a technically perfected security interest which is not disclosed on the certificate of ownership.[14] This holding will not affect mobilehome transactions that occurred on or after July 1, 1981, the date on which mobilehome registration became subject to the Health and Safety Code. It will apply to transactions involving all other vehicles which remain subject to registration under the Vehicle Code unless and until the Legislature changes the relevant statutes.

The judgment is reversed and the trial court is instructed to enter its judgment declaring T&O the legal owner of the mobilehome and enjoining UCB from repossessing it.

Mosk, J., Broussard, J., Reynoso, J., and Lucas, J., concurred.

**KAUS, J.**\*—I respectfully dissent.

---

[14]It is unnecessary to decide here whether a different result would be compelled in a case where the registration transfer requirements of Vehicle Code section 5600 applied and the transferee had failed to comply. (See *ante,* at pp. 453-454.)

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

As both the trial court and the Court of Appeal clearly saw, the issues in this case are quite simple and unerringly point to priority of United California Bank's (UCB) security interest which was perfected in compliance with all applicable provisions of law. Unfortunately the majority obscures this simplicity by (1) an erroneous suggestion that the California Uniform Commercial Code's (hereafter Commercial Code) protections for perfected security interests are primarily designed to establish priorities among lien-holders,[1] (2) an outdated analysis of California's "full title system," (3) an inapplicable analogy to real property recording, (4) a meticulous but, I believe, irrelevant description of post-1979 law, and, finally, (5) a misplaced appeal to principles of equity.[2]

The applicable statutes are found in the Vehicle Code and the Commercial Code. Vehicle Code sections 6300 and 6301—amended as part of the same chapter which enacted the Commercial Code (Stats. 1963, ch. 819)—prescribe the mechanics for the recording of a security interest in a vehicle. Briefly, section 6300 calls for the deposit of certain documents with the Department of Motor Vehicles. Section 6301 then provides that the deposit "constitutes perfection of the security interest and the rights of all persons in the vehicle *shall be subject to the provisions of the Uniform Commercial Code, . . .*" (Italics added.) To be specific: if the party to be secured has done all that is required of him, we look to the Commercial Code for the consequences of slipups by the filing officer—here, of course, the Department of Motor Vehicles.[3]

It is at this point in its analysis of applicable statutory law that the majority leaves the straight and narrow. (*Ante,* p. 448.) It states that the rule that perfected security interests are good against bona fide purchasers is premised on the assumption that filing of a security interest will result in a record

---

[1]Section 9201 of the Commercial Code begins as follows: "Except as otherwise provided by this code a security agreement is effective according to its terms between the parties, *against purchasers of the collateral and against creditors.*" (Italics added.)

[2]Equity! T & O Mobile Homes, Inc. (T&O), a professional dealer in mobilehomes, paid $7,000 for a unit on which UCB, another pro, had loaned more than twice as much. If T&O had been charged with receiving stolen property, the disproportionately low price it paid for the mobilehome would have been evidence of guilty knowledge. (*People* v. *Brumley* (1966) 242 Cal.App.2d 124, 128 [51 Cal.Rptr. 131]; *People* v. *Bartfeld* (1962) 204 Cal.App.2d 701, 705 [22 Cal.Rptr. 618].) Undoubtedly it was only recognition of the doctrine of the "white heart and the empty head" (see *Morgan* v. *Reasor* (1968) 69 Cal.2d 881, 894, fn. 19 [73 Cal.Rptr. 398, 447 P.2d 638]) that made UCB stipulate that T&O had no *actual*—my emphasis—knowledge of UCB's interest and would not have bought, had it known of it. It is, of course, true that section 1103 of the Commercial Code provides that, inter alia, principles of equity supplement its provisions, wherever the code is silent. The trouble is, however, that it is not silent on the point in issue here, but explicitly commands a result contrary to the majority.

[3]Henceforth, unless otherwise indicated, all statutory references are to the Commercial Code.

which a prospective purchaser can discover. From this premise it concludes that if a record is not discoverable, we can ignore the Commercial Code. The premise is, however, only half-true and the conclusion is quite mistaken. It is, of course, to be hoped that filing will result in a discoverable record, but—even if we ignore the inevitable delay in indexing (§ 9403, subd. (4)(a))—mistakes happen and it begs the question presented by this case simply to abandon the Commercial Code because a perfected security interest is not discoverable.

It is not as if the problem of a slipup by the filing officer had not been considered. To the contrary, the wording of the relevant provisions of the Commercial Code, the official comment thereto and Mr. Anderson's authoritative treatise on the code, are in perfect harmony to the effect that a perfected security interest is not lost because of a mistake by the filing officer. Section 9303 provides that a security interest is perfected when it has attached[4] and the applicable steps toward perfection, such as filing, have been taken. Section 9403 states that filing consists of "[p]resentation for filing . . : tender of the filing fee and acceptance . . . by the filing officer." Nothing further is required. The Uniform Commercial Code comment to section 9-407 (§ 9407) states unequivocally: "Note . . . that under section 9-403(1) *the secured party does not bear the risk that the filing officer will not properly perform his duties:* under that Section the secured party has complied with the filing requirements when he presents his financing statement for filing and the filing fee has been tendered or the statement accepted by the filing officer." (Italics added.) In 4 Anderson, Uniform Commercial Code, section 9-403:5, the author states: "The secured party does not bear the risk of an improper filing or indexing by the filing officer, as long as the secured party has not by his own conduct caused the error by misleading the filing officer. [¶] The Code adopts the concept that filing is constructive notice from the time of presentation to the filing officer, rather than from the later time of indexing. . . . [¶] The rationale of the Code provision defining 'filing' is to make certain the time of filing and to free the secured party from errors or mistakes on the part of the filing officer." (*Id.*, at pp. 519-520.)

Although no California case in point has been found, the authorities from other jurisdictions uniformly agree that the Commercial Code means what it says. (*Matter of Glasco, Inc.* (5th Cir. 1981) 642 F.2d 793, 796 ["A creditor who has complied with the filing requirements does not bear the risk of improper indexing by the Secretary of State."]; *In re Royal Electro-*

---

[4]Section 9204 sets forth the conditions which must be satisfied for a security interest to "attach." Since it is clear that UCB's interest had attached, the point need not be pursued.

*type Corporation* (3d Cir. 1973) 485 F.2d 394, 396; *In re Hammons* (D.Miss. 1977) 438 F.Supp. 1143, 1151 ["Nor is the secured party an insurer of proper indexing."]; *Matter of Fowler* (D.Okla. 1975) 407 F.Supp. 799, 803; *In re May Lee Industries, Inc.* (D.N.Y. 1974) 380 F.Supp. 1, 3.)[5]

This phalanx of authority to the effect that the secured party does not have to bear the risk of a slipup in the recording system, is simply ignored by the majority, which offers us nothing better than (a) an imperfect analogy to the real property recording system[6] and (b) a reference to California's "full title" system which, as far as I can tell, never did encounter—let alone solve—the problem posed by this case. Certainly the two decisions relied on by the majority are not in point. *First Nat. Bank of Hays City* v. *Sprigg* (1962) 209 Cal.App.2d 258 [25 Cal.Rptr. 838] involved as the creditor a Kansas bank which failed to note its lien on the certificate of title before handing it over to the debtor, who drove the car to California where he sold it. The court held, most plausibly, that the bank was estopped to claim its lien. Even less pertinent is *Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339 [87 Cal.Rptr. 226], where an employee of the creditor neglected to indicate its security interest when submitting the relevant documents to the Department of Motor Vehicles.[7]

---

[5]*General Motors Acceptance Corporation* v. *Hodge* (Ky. 1972) 485 S.W.2d 894 is not to the contrary. There the court interpreted a recently passed statute to require that a security interest be shown on the face of the certificate of registration before it was perfected. The statute was apparently passed in response to a contrary holding in *Lincoln Bank & Trust Company* v. *Queenan* (Ky. 1961) 344 S.W.2d 383. In the case at bar there is no question that under California law UCB had perfected its lien. (Veh. Code, § 6301.)

[6]The applicable statutes there require not only that the instrument be filed with the recorder, but that, to give constructive notice, it be "recorded as prescribed by law." (See Civ. Code, §§ 1170, 1213; *Cady* v. *Purser* (1901) 131 Cal. 552 [63 P. 844].) No comparable statute applies to this case.

[7]Since, as I have tried to show, the majority seeks to solve this case without resort to the pertinent statutory law—the Commercial Code—it inevitably goes awry in several respects. Two examples are illustrative:

1. The majority states that the purpose of the provision of section 6301 of the Vehicle Code imparting constructive notice from the time of the secured party's application for registration as legal owner is "primarily to establish priority among two or more competing *lienholders* . . . ." (Italics in original.) Section 6301 expressly states that the "rights of *all persons* . . ." shall be subject to the Commercial Code. Does "all persons" not include buyers?

2. The majority labels as a "dubious proposition" UCB's argument that it should prevail because T&O did not apply for a transfer to itself under section 5600 of the Vehicle Code. I agree that the argument is bad, but the criticism sounds strange in an opinion which relies on the real property recording acts by analogy: section 1214 of the Civil Code only protects subsequent purchasers "whose conveyance is first duly recorded." The majority gets out of its dilemma by pointing out that, as a dealer, T&O did not have to comply with section 5600. Does this mean that the majority's equitable rule protects professional dealers but leaves consumers to twist in the wind?

In conclusion I would simply ask what the Legislature could have intended by providing in section 6301 of the Vehicle Code that "the rights of all persons in the vehicle shall be subject to the provisions of the Uniform Commercial Code" if, the first time an occasion for applying this command arises, we simply ignore it?

I would affirm.

Grodin, J., concurred.