[No. H007461. Sixth Dist. Oct. 11, 1991.]

SANTA CRUZ TRANSPORTATION, INC., Plaintiff and Respondent, v. UNEMPLOYMENT INSURANCE APPEALS BOARD, Defendant and Appellant;
ED GALLEGOS, Real Party in Interest.

**COUNSEL**

Daniel E. Lungren, Attorney General, Charlton Holland, Assistant Attorney General, Stephanie Wald and John C. Porter, Deputy Attorneys General, for Defendant and Appellant.

Bosso, Williams, Levin, Sachs & Book, Robert E. Bosso and Alyce E. Prudden for Plaintiff and Respondent.

Elliott Wax for Real Party in Interest.

**OPINION**

**CAPACCIOLI, Acting P. J.**—In a proceeding initiated to obtain disability benefits by real party in interest Ed Gallegos, California Unemployment Insurance Appeals Board (Board) appeals from a judgment ordering issuance of a peremptory writ of mandate. The writ commands it to set aside a decision holding that Gallegos was an employee of Santa Cruz Transportation, Inc., doing business as Yellow Cab Company (Yellow Cab), and therefore entitled to increased disability benefits. The writ further orders reinstatement of the decision of an administrative law judge which held that Gallegos drove a taxicab owned by Yellow Cab as an independent contractor and was therefore precluded from increased benefits. We conclude that the judgment is not supported by substantial evidence and reverse.

SCOPE OF REVIEW

 The function of the superior court in reviewing decisions granting or denying unemployment insurance benefits is to exercise its independent judgment on the evidence and inquire whether the administrative agency's findings are supported by the weight of the evidence. (*Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 774-775 [163 Cal.Rptr. 619, 608 P.2d 707].) "While the superior court exercises its independent judgment on the administrative evidence, California law accords the appellate court a much narrower scope of review, confining it to an inquiry whether the superior court's findings are supported by substantial evidence. [Citation.] The appellate court's review of the superior court

judge's gleanings from the administrative transcript is just as circumscribed as its review of a jury verdict or judge-made finding after a conventional trial. On appeal, after the superior court has applied its independent judgment to the evidence, all conflicts must be resolved in favor of the respondent and all legitimate and reasonable inferences made to uphold the superior court's findings; moreover, when two or more inferences can be reasonably deduced from the facts, the appellate court may not substitute its deductions for those of the superior court." (*Lacy* v. *California Unemployment Ins. Appeals Bd.* (1971) 17 Cal.App.3d 1128, 1134 [95 Cal.Rptr. 566].)

■ "Substantial evidence, of course, is not synonymous with 'any' evidence, but is evidence which is of ponderable legal significance. It must be 'reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' [Citations.] Thus, the focus is on the quality, not the quantity of the evidence. Very little solid evidence may be 'substantial,' while a lot of extremely weak evidence might be 'insubstantial.'" (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court* (1990) 220 Cal.App.3d 864, 871-872 [269 Cal.Rptr. 647].)

■ The burden of establishing an independent contractor relationship is upon the party attacking the determination of employment. (*Isenberg* v. *California Emp. Stab. Com.* (1947) 30 Cal.2d 34, 38 [180 P.2d 11]; see *Tieberg* v. *Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 951 [88 Cal.Rptr. 175, 471 P.2d 975].) Thus, in this case, Yellow Cab carried its burden and proved to the trial court that Gallegos was an independent contractor. In examining whether the judgment in this case is supported by substantial evidence, we therefore focus upon the sufficiency of the evidence to sustain a finding of independent contractor status.

The facts of this case are undisputed, although some are subject to different inferences.

### BACKGROUND

Yellow Cab is the only taxicab business in Santa Cruz, having purchased all of the licenses of competing companies. Prior to January 1988, the drivers for Yellow Cab were employees paid on a commission basis. In January 1988, Yellow Cab adopted a system under which most drivers leased cabs and were no longer deemed employees. It retained two drivers as employees who were available to take fares that were refused by lessee-drivers.

Gallegos was between jobs and drove a taxicab for approximately three months in the autumn of 1988. The disability he asserted in the administrative proceedings predated this tenure.

Gallegos signed a lease agreement designating him as "Lessee" and Yellow Cab as "Lessor." The lease provided that Gallegos would lease a cab for a 12-hour period specified by Yellow Cab for $55-$60 per shift (plus $2.50 per shift, if elected, for Yellow Cab's waiver of liability for collision damage not the fault of Gallegos) depending upon the day and time of the shift; that the lease period would be considered renewed for like periods unless terminated by either party; that the lease could be terminated or not renewed at any time by either party but that specific cause for Gallegos's termination would be his failure to abide by laws governing the operation of taxicabs, motor vehicles, and radios or his failure to maintain good public service relations; that a taxicab could be used on two shifts per day and therefore Gallegos could be charged up to the amount for one full shift if he was more than one-half hour late in returning his taxicab; that Yellow Cab would maintain the taxicab, except for repairs due to Gallegos's negligence, and pay for all licenses, taxes, ownership fees, and third party liability insurance; that Gallegos would pay for all gasoline used during a shift and personal licenses and traffic tickets; that Gallegos was not restricted as to an area in Santa Cruz County in which he could operate; that Yellow Cab would refer business on a nondiscriminatory basis by radio and Gallegos had the right to refuse referrals; that the relationship was one of lessor and lessee, Gallegos was not the employee of Yellow Cab but an independent contractor, and Yellow Cab would not make income tax withholding payments or contributions for unemployment insurance and the like on Gallegos's behalf; that Gallegos was not required to report or account to Yellow Cab for his fares, but that he would charge fares approved by the City of Santa Cruz; that Gallegos was required to accept customer charge slips as fares and submit them for reimbursement as a credit upon future lease payments or in cash provided he pay $.10 per charge slip; that Gallegos would schedule meal breaks through Yellow Cab to provide adequate taxicab service; that Gallegos was not assigned any fixed hours during the lease period; and that Gallegos was prohibited from using the taxicab for personal use.

Gallegos testified that he customarily worked a 10-hour day beginning at 6 a.m. on the 6 a.m. to 6 p.m. shift, could have chosen either the daytime or evening shift, but that Yellow Cab's owner, Jim Bosso, determined the hours and days that he had a taxicab. In response to a question whether, on a Monday, he could have then elected not to work the rest of the week, Gallegos stated that he supposed he could have, but he also indicated that he was told he might not be given a lease if he declined a lease too many times and he wanted to make money and therefore would not "go off and play."

Gallegos indicated that he used his taxicab for personal business to look for another job when he had time between calls; that he knew he could refuse referrals and, in fact, did refuse one referral because he knew the customer to be drunk at the time; and that his fares were given to him by the dispatcher over the radio and his livelihood depended upon the dispatcher.

Gallegos also related that he was required by Yellow Cab to maintain a daily trip sheet which listed for each fare the number of passengers, the amount of the fare, and the pickup and delivery places. A typical trip sheet was introduced in evidence at the administrative hearing. The sheet also provided for specification of the total mileage driven during the day.

Gallegos further stated that when he wished to take a meal he would call the dispatcher and ask whether taking a meal break was convenient for the dispatcher and, if there were too many cab drivers out, he was required to delay his break. He also indicated that he learned that the lease meant that he was working for himself after he had signed the lease.

Bosso admitted that he required his drivers to wear caps identifying them as cab drivers to comply with a requirement of the City of Santa Cruz that taxicab drivers wear some article of clothing with such an identification. Other evidence indicated that Yellow Cab also prohibited its lessees from wearing printed tee shirts unless they said "Yellow Cab" on them, Levi's, beards, and hair below the collar. Bosso stated these later requirements were recommendations, but Gallegos understood that he risked being refused a lease unless he abided by the dress code. Bosso also indicated that he believed he was required to maintain trip sheets by the City of Santa Cruz for the benefit of its police department. The superior court admitted into evidence a declaration of Santa Cruz Deputy Chief of Police Steven Belcher which stated that Belcher had found no municipal requirement that taxicab drivers maintain a log of fares and to the best of Belcher's knowledge "this issue has never come up."

### THE FINDINGS MADE IN THE STATEMENT OF DECISION

The superior court concluded that Gallegos was an independent contractor based upon the following facts:

1. Gallegos signed the lease acknowledging he was an independent contractor and agreeing to be responsible for all tax withholdings or contributions, knew he was an independent contractor during the time he drove a

taxicab, and stated that he was an independent contractor in his application for benefits;

2. Gallegos was free to use the taxicab for as much as he wished during the 12-hour shift and customarily used it for less than 12 hours;

3. Gallegos was free to use the taxicab for personal use;

4. The lease payment to Yellow Cab was fixed and therefore amounted to an entrepreneurial risk to Gallegos;

5. Gallegos was free to refuse referrals by the dispatcher and did so;

6. There was no company requirement that taxicab drivers report fares and no evidence that any fare information, other than charged fares, had ever been used by Yellow Cab;

7. Yellow Cab maintained two employees who were not permitted to refuse referrals;

8. There was no evidence that Gallegos ever was or applied to be an employee of Yellow Cab;

9. Fare rates were set by municipalities and not Yellow Cab; and,

10. There was no evidence that taxicab driving is an unskilled occupation.

The superior court concluded: "In summary, [Gallegos] had the ability to use the taxicab to earn a living in whatever manner he chose during the lease period, free from Company intervention which would constitute control."

DISCUSSION

Under the Unemployment Insurance Code and as relevant to this case, an employee is "[a]ny individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." (Unemp. Ins. Code, § 621, subd. (b).)

"The distinction between independent contractors and employees arose at common law to limit one's vicarious liability for the misconduct of a person rendering service to him. The principal's supervisory power was crucial in

that context because '. . . [t]he extent to which the employer had a right to control [the details of the service] activities was . . . highly relevant to the question whether the employer ought to be legally liable for them. . . .' [Citations.] Thus, the 'control of details' test became the principal measure of the servant's status for common law purposes. Much 20th-century legislation for the protection of 'employees' has adopted the 'independent contractor' distinction as an express or implied limitation on coverage. The [Workers' Compensation] Act plainly states the exclusion of 'independent contractors' and inserts the common law 'control-of-work' test in the statutory definition. The cases extend these principles to other 'employee' legislation as well. ■ Following common law tradition, California decisions applying such statutes uniformly declare that '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. . . .' [Citations, including cases from unemployment insurance law.]" (*S. G. Borello & Sons, Inc.* v. *Department of Industrial Relations* (1989) 48 Cal.3d 341, 350 [256 Cal.Rptr. 543, 769 P.2d 399].)

"The right to control the means by which the work is accomplished is clearly the most significant test of the employment relationship . . . ." (*Tieberg* v. *Unemployment Ins. App. Bd.*, *supra*, 2 Cal.3d at p. 950.) ■ We therefore examine the superior court's findings insofar as they identify evidence that Yellow Cab did not have the right to control the manner and means of accomplishing the result desired.

We observe that findings #4, #8, and #10 do not directly pertain to the issue of control but are more properly characterized as "[a]dditional factors . . . derived principally from the Restatement Second of Agency." (*S. G. Borello & Sons, Inc.* v. *Department of Industrial Relations*, *supra*, 48 Cal.3d at p. 351.) "[T]he cases which have recognized the Restatement's multiple factor enumeration have emphasized that employer control is clearly the most important and the others merely constitute 'secondary elements.' [Citations.]" *Toyota Motor Sales U.S.A., Inc.* v. *Superior Court*, *supra*, 220 (Cal.App.3d 864, 875.)[1] We therefore address findings #4, #8, and #10 separately.

---

[1]The elements "include (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. [Citations.] 'Generally, . . . the individual factors

*Finding #1*

█ That Gallegos signed the lease and believed he was an independent contractor is not solid evidence in support of the superior court's conclusion.

An "agreement characterizing the relationship as one of 'client—independent contractor' will be ignored if the parties, by their actual conduct, act like 'employer—employee.' [Citations.]" (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court, supra,* 220 Cal.App.3d at p. 877 [holding that no substantial evidence supported trial court's determination of independent contractor status in context of an order finding good faith settlement].) Stated another way, "where compelling indicia of employment are otherwise present, we may not lightly assume an individual waiver of the protections derived from that status." (*S. G. Borello & Sons, Inc.* v. *Department of Industrial Relations, supra,* 48 Cal.3d at p. 358.)

█ Here, the lease itself contains many indicia of control by Yellow Cab over Gallegos. It allows Yellow Cab to terminate Gallegos. This is strong evidence in support of an employment relationship. (*Isenberg* v. *California Emp. Stab. Com., supra,* 30 Cal.2d at p. 39.) More particularly, the lease cites failure to maintain good public relations as a specific reason for termination. This is an unquestionable control upon Gallegos's behavior as a taxicab driver. (Cf. *Yellow Cab Cooperative, Inc.* v. *Workers' Comp. Appeals Bd.* (1991) 226 Cal.App.3d 1288, 1298 [277 Cal.Rptr. 434] [that taxicab drivers were instructed on matters of behavior toward the public indicated control].) In addition, under the lease Yellow Cab designates the time period when a daily shift begins and ends. (Cf. *Id.* at pp. 1298-1299 ["Yellow controlled drivers' hours by assigning shifts. Yellow imposed this control so that it could lease each cab to more than one driver in one day. This practice resembled a paradigmatic employment relationship and significantly restricted applicant's independence."].) The lease also gives Yellow Cab the right to coordinate when Gallegos may take a meal break; it prohibits Gallegos from using the taxicab for personal purposes; and it requires Gallegos to accept charge slips from certain customers. These provisions are unquestionably directives by Yellow Cab as to the manner and means of accomplishing the result desired. (*S. G. Borello & Sons, Inc.* v. *Department of Industrial Relations, supra,* 48 Cal.3d at p. 350.)

Moreover, the parties' actual conduct displayed many indicia of control by Yellow Cab over Gallegos. Yellow Cab maintained a dress code. Bosso's

cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' [Citation.]" (*S. G. Borello & Sons, Inc.* v. *Department of Industrial Relations, supra,* 48 Cal.3d at p. 351.)

statement that most of the code was voluntary does not negate that Yellow Cab had rules telling its drivers how to dress and that Gallegos took the rules seriously. A belief that one will not be rehired if he fails to follow instructions is relevant to show submission to control. (*Isenberg* v. *California Emp. Stab. Com.*, *supra*, 30 Cal.2d at p. 40.) Despite the contrary provision in the lease, Yellow Cab required Gallegos to account for his fares via the trip sheet. "[T]he presence of a trip sheet requirement militates strongly in favor of employer control." (*City Cab Co. of Orlando, Inc.* v. *N.L.R.B.* (1980) 628 F.2d 261, 264, italics omitted.) Bosso's statement that he believed the City of Santa Cruz required taxicab drivers to maintain trip sheets does not detract from this aspect of control since Bosso's belief had no basis.

In addition, as we explain in connection with findings #2, #3, and #5, Gallegos was dependent upon Yellow Cab for his livelihood.

Under these circumstances, we disregard the lease as weak evidence that Yellow Cab did not exercise control over Gallegos and conclude that it does not constitute substantial evidence of independent contractor status. (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court*, *supra*, 220 Cal.App.3d at pp. 877-878.)

*Findings #2, #3 and #5*

That Gallegos was not required to work for 12 hours, customarily did not work 12 hours, and was free to refuse referrals from the dispatcher does not tend to support a finding of no control by Yellow Cab over Gallegos.

We agree that, in the abstract, one could infer independent contractor status from facts suggesting that a taxicab driver was free to work or not work, refuse work, and use the taxicab for personal business. The reality of this case, however, is that Gallegos was not blessed with this freedom. Gallegos testified that he wanted to make money and this goal depended upon the dispatcher. Since Yellow Cab was the only taxicab business in Santa Cruz, Gallegos was totally dependent upon Yellow Cab's dispatcher for his livelihood.

That Gallegos once refused a dispatch because the customer was drunk illustrates a circumstance where any taxicab driver would justifiably refuse a fare rather than of Gallegos's freedom to refuse work. That Gallegos used his taxicab for personal business illustrates a circumstance for which he could have been terminated rather than of his freedom to not work.

The point that Gallegos's freedom was illusory was laid to rest in *Yellow Cab Cooperative, Inc.* v. *Workers' Comp. Appeals Bd.*, *supra*, 226 Cal.App.3d 1288. There, the court reviewed and agreed with a decision by the Workers' Compensation Appeals Board holding that Yellow Cab was the employer of a cabdriver for workers' compensation purposes under facts similar to those presented here. Among other claims urged in support of its writ petition, Yellow Cab argued that the lease and cabdriver's testimony demonstrated the cabdriver's actual independence. The court concluded that the evidence was of little value as proof of independent contractor status. The court's analysis of the issue is equally applicable to the facts of this case. The court explained as follows: "Petitioners emphasize applicant's supposed independence under the lease and his testimony that he could go wherever he wanted with the cab, did not have to take radio calls, could run personal errands, and could use the cab to carry family members instead of paying passengers. Applicant testified that he did not have to show up for work at all, although failure to do so would cost him $56 a day. [¶] This evidence has little weight as proof of independent contractorship. The work did not involve the kind of expertise which requires entrustment to an independent professional; it 'is usually done without supervision whether the arrangement was lessee or employee, and the skill required on the job is such that it can be done by employees rather than specially skilled independent workmen.' [Citations.] Indeed applicant had enjoyed a similar degree of freedom as a unionized employee during the 1960's. Even then he could see a doctor, disregard a radio call, or arrange for his own customers. It is thus apparent that a good deal of freedom was 'inherent in the nature of the work.' [Citation.] [¶] Furthermore, to the extent applicant's freedom might appear to exceed that of a typical employee, it was largely illusory. If he wanted to earn a livelihood he had to work productively, and that meant carrying paying passengers. [Citations.] There is no evidence that he could accomplish this without sacrificing his theoretical independence and subjecting himself to Yellow's control." (*Yellow Cab Cooperative, Inc.* v. *Workers' Comp. Appeals Bd.*, *supra*, 226 Cal.App.3d at p. 1299.)

At best, the facts recited in findings #2, #3, and #5 support a weak inference of no control. The evidence of the reality of Gallegos's circumstance, however, supports a solid contrary inference. We therefore conclude that the facts recited in findings #2, #3, and #5 are insubstantial evidence to support the superior court's conclusion.

### Finding #6

The superior court was simply incorrect in finding that there was no known company requirement that Gallegos maintain a trip sheet. Both Gallegos and Bosso affirmed the existence of the requirement.

That there was no evidence that Yellow Cab used the trip sheet as a means of holding Gallegos accountable for his income is of no value in this case. We reiterate that Gallegos was not required to prove control; Yellow Cab was required to prove no control. Thus, the failure of proof that Yellow Cab used the trip sheet to control Gallegos is of no consequence.

### Finding #7

That Yellow Cab acknowledged having two employees so as to accept dispatches refused by Gallegos has no tendency to prove Yellow Cab's lack of control over Gallegos given that Gallegos's freedom to refuse referrals was illusory.

### Finding #9

That the City of Santa Cruz set taxicab fare rates has no tendency in reason to prove Yellow Cab's lack of control over Gallegos.

Thus, our analysis of the superior court's findings on the most important factor in determining whether a person acting for another is an employee or independent contractor exposes the findings as flawed and, at best, insubstantial evidence in support of the superior court's conclusion.

### Secondary Elements

Finding #4 was that the nature of the fixed lease payment "constituted an entrepreneurial contribution by [Gallegos] and constitutes a substantial financial risk."

We agree with the court in *Yellow Cab Cooperative, Inc.* v. *Workers' Comp. Appeals Bd., supra,* 226 Cal.App.3d 1288 which rejected this proposition as follows: "Petitioners suggest that the drivers' payments to Yellow created greater entrepreneurial risk and made the workers more like independent businesspersons than was the case in *Borello.* The court there found little entrepreneurial character in the work because the workers were paid according to the size and grade of their crop, they did not set the price, and the risk that the crop might be unharvestable was no different from the risk they would run if they were employees. [Citation.] In the first two respects the cabdrivers' work here is closely analogous: drivers did not set their own rates but were paid according to the number and distance of fares they carried. The only risk they ran beyond that in *Borello* was that in the worst case they might lose money on a given shift. There was no evidence that this ever occurred; applicant testified that he averaged $82.50 per shift in

earnings, after paying rent on the cab. In any event there is no basis for characterizing this risk as 'entrepreneurial.' There is no evidence that earnings varied with the drivers' skills, entrepreneurial or otherwise. The evidence on this point does not tip the balance far enough to warrant a result different from that in *Borello*." (*Id.* at pp. 1300-1301, fn. omitted.)

Similarly, there is no evidence in this case that earnings varied with the drivers' skills. In addition, there is no practical difference in the manner Gallegos earned his livelihood and the manner Yellow Cab's employees on commission earned their livelihood. Each was referred customers and earned according to the number and distance of fares carried. There was no evidence that Gallegos had the potential to make more money than Yellow Cab's employees because he was a lessee.

Moreover, Yellow Cab is not merely in the business of leasing taxicabs and collecting rent akin to Hertz Rent-A-Car and like enterprises. It owns the taxicabs and municipal taxicab license; customers call it for taxicab service, and it arranges for performance of the service; and the taxicabs bore Yellow Cab's identity. In sum, the public deals with Yellow Cab. There is no evidence that Gallegos advertised his individual services. "We follow courts elsewhere in holding that Yellow's enterprise consists of operating a fleet of cabs for public carriage." (*Yellow Cab Cooperative, Inc.* v. *Workers' Comp. Appeals Bd.*, *supra*, 226 Cal.App.3d at p. 1293.) In other words, the work performed by the lessees in this case is part of the regular business of Yellow Cab. The modern tendency is to find employment when the work being done is an integral part of the regular business of the employer and the worker does not furnish an independent business or professional service relative to the employer. (*S. G. Borello & Sons, Inc.* v. *Department of Industrial Relations*, *supra*, 48 Cal.3d at p. 357.)

The fixed leased payment is simply weak evidence that Gallegos was engaged in an entrepreneurial enterprise and insufficient to tip the scales given the absence of substantial evidence on the principal issue of control.

Finding #8 was that there was no evidence that Gallegos ever was or applied to be an employee.

The significance of this point escapes us. Had there been evidence that Yellow Cab offered Gallegos a choice of status, an inference might be drawn that Gallegos understood and voluntarily undertook independent contractor status.(See *S. G. Borello & Sons, Inc.* v. *Department of Industrial Relations*, *supra*, 48 Cal.3d at p. 359.) That there was no evidence on the issue only

suggests that Gallegos had no choice and did not voluntarily undertake independent contractor status.

Finding #10 was that there was no evidence that taxicab driving is an unskilled occupation. This finding is not affirmative evidence that taxicab driving is a skilled occupation, which might justify an inference of independent contractor status.

The judgment is reversed. The trial court is directed to recall the peremptory writ of mandate issued on August 7, 1990, and enter a judgment denying Yellow Cab's petition. Costs are awarded to Board.

Premo, J., and Bamattre-Manoukian, J., concurred.