In re BABAEIAN TRANSPORTATION
CO., Debtor.

Dennis I. SIMON, Chapter
11 Trustee, Plaintiff,

v.

CHRYSLER CREDIT CORPORATION,
Defendant.

Bankruptcy No. LA 95–31068 SB.

United States Bankruptcy Court,
C.D. California.

Jan. 14, 1997.

Richard Esterkin of Morgan, Lewis & Bockius LLP, Los Angeles, CA, for trustee.

Robbin L. Itkin of Wynne, Spiegel, Itkin, Los Angeles, CA, for Creditors Committee.

Ralph S. Greer, Glendale, CA, for Mehrdad Akbari and Vartan Patrosy.

Richard J. Kahdeman of Davis & Kahdeman, Glendale, CA, for Western Financial Savings Bank.

John D. Duncan of Cooksey, Howard, Martin & Toolen, Costa Mesa, CA, for Chrysler Credit Corp.

## DECISION ON SUMMARY JUDGMENT MOTION

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. INTRODUCTION

This adversary proceeding raises the question of whether Chrysler Financial Corporation ("Chrysler Financial") properly perfected its security interests in six automobiles that the debtor Babaeian Transportation Co. ("Babaeian") used as taxicabs. In form, Babaeian leased the vehicles to its drivers, who paid monthly lease payments to Babaeian. Thereafter, the former general manager "took" four of the vehicles, and subsequently used them in his own business, which was apparently also a taxicab firm.

The court holds that, when this bankruptcy case was filed, Babaeian held all of the vehicles as inventory under the statutory definition in the California version of the Uniform Commercial Code ("California U.C.C."), which differs somewhat from the Model Uniform Commercial Code ("Model U.C.C."), and that the perfection of a security interest in such inventory requires the filing of a UCC–1 financing statement with the California Secretary of State. Chrysler Financial did not file a UCC–1: instead, it obtained endorsed certificates of ownership showing it as the legal owner of the vehicles, pursuant to the California Vehicle Code. In consequence, Chrysler Financial's security interests in the vehicles are unperfected, because

it used the wrong procedure for perfecting its security interests.

Thus the trustee is entitled to avoid Chrysler Financial's liens, and Chrysler Financial is an unsecured creditor in this case.

## II. FACTS

Between September 2, 1993 and March 2, 1994 Babaeian purchased six new 1994 Dodge automobiles from Glendale Dodge, Inc. ("Glendale Dodge"). Ranjit Puri was the Glendale Dodge salesman who sold all six vehicles to Babaeian. Each of the sales contract forms is apparently identical, and is labeled, "Precomputed (Add–On) Interest Motor Vehicle Contract and Security Agreement."[1] Each form clearly shows the purchaser as "Babaeian Transportation Inc."[2] Pursuant to information provided to Glendale Dodge, the certificate of title for each vehicle indicates that the vehicles were purchased for commercial use.

Glendale Dodge assigned each sales contract to Chrysler Credit Corporation ("Chrysler Credit"), which subsequently merged into Chrysler Financial, the defendant in this adversary proceeding. Chrysler Credit obtained a certificate of ownership, commonly known as a "pink slip" (because of its color), for each of the vehicles, which shows it as the lienholder.

Babaeian conducted its business by leasing vehicles to drivers to operate as taxicabs[3] in the communities where Babaeian was licensed to conduct business. The drivers paid Babaeian fixed lease payments of $500 to $600 per week. The lease payments did not vary with the amount of fares that the drivers collected. If the drivers collected more (which presumably they usually did, or they would not have made a living at the job), they were entitled to keep all of the excess; if they collected less, they still owed the fixed payments every week. Babaeian used all of the vehicles here at issue in this manner immediately after their purchase, and so used two of the vehicles until the postpetition sale.

Four of the six vehicles ("the Schaffer vehicles") are in the possession of Scott Schaffer ("Schaffer"), the former general manager of Babaeian, who left Babaeian in April, 1994 and "took" the vehicles with him. Although there is no evidence before the court on the subject,[4] apparently Schaffer is conducting his own taxicab business: he claims that he is using the Schaffer vehicles as "business equipment." The Schaffer vehicles are presently in storage because Schaffer has been unable to renew their registrations, since Babaeian continues to own them.

After the filing of this bankruptcy case and the appointment of a chapter 11 trustee, the trustee sold the business, including some sixty automobiles, and the liens have been transferred to the proceeds. As to the Schaffer vehicles, the sale was subject to Schaffer's claims in the vehicles.

The trustee has brought this adversary proceeding for a determination that Chrysler Financial's security interests in the six vehicles are unperfected and avoidable, because Babaeian held the property as inventory, which required the filing of a UCC–1 (which Chrysler Credit and Chrysler Financial failed to do) to perfect its security interests.

## III. ANALYSIS

The parties agree on the foregoing facts, and have presented their entire evidentiary record in this summary judgment[5] proceeding. The court finds that there is no factual

---

1. Many of the provisions on the front side of this agreement are prescribed by California statute. See Reese–Levering Motor Vehicle Sales and Finance Act, codified in CAL.CIV.CODE § 2981–2984.4 (West 1993 & Supp.1996).

2. Several of the contracts show Schaffer as a "co-buyer." However, the title certificates all show only Babaeian as the owner of record. There is no evidence that Schaffer had any ownership interests in the Schaffer vehicles when this bankruptcy case was filed.

3. Some of the drivers for Babaeian owned their own vehicles.

4. Because this is a summary judgment motion, the court must conclude that all of the relevant evidence is before the court.

5. The summary judgment hearing in this adversary proceeding has been consolidated with that in four other adversary proceedings, which are based on similar facts.

dispute that requires the taking of testimony in this adversary proceeding. The parties dispute only the legal conclusion to be drawn from the facts. Accordingly, the court determines this dispute is a "trial without witnesses" under Rule 43(e) of the Federal Rules of Civil Procedure. *See Official Committee of Creditors v. Shearson Lehman Brothers Holdings (In re First Capital Holdings Corp.)*, 179 B.R. 902, 905–06 (Bankr. C.D.Cal.1995); WILLIAM W. SCHWARZER ET AL., THE ANALYSIS AND DECISION OF SUMMARY JUDGMENT MOTIONS 39–40 (1991).

■ The nature, validity and perfection of security interests in personal property, like other property interests, are governed by state law. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). Unless bankruptcy law provides differently, such an interest is not analyzed differently simply because Babaeian is in bankruptcy. *Id.*

### A. The Trustee's Rights as Lien Creditor

■ An unperfected security interest is binding between the parties. The lack of perfection creates a problem only when an intervening third party obtains a perfected security interest that trumps the unperfected interest.

The parties agree that the trustee enjoys the status of a lien creditor, and thus his interest has priority over an unperfected security interest. This status is provided by two statutes. First, Bankruptcy Code § 544(a) provides:

The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor ... that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists....

11 U.S.C.A. § 544(a) (West 1994). Similarly, California U.C.C. § 9301(3) specifies:

A "lien creditor" ... includes ... a trustee in bankruptcy from the date of the filing of the petition....

CAL.COM.CODE § 9301(3) (West Supp.1996).

■ Under these statutory provisions, the trustee stands in the shoes of a hypothetical lien creditor whose lien arose on the day that the bankruptcy petition was filed. *Raiton v. G & R Properties (In re Raiton)*, 139 B.R. 931, 934 (9th Cir. BAP 1992); *Wind Power Systems, Inc. v. Cannon Financial Group, Inc. (In re Wind Power Systems, Inc.)*, 841 F.2d 288, 292 (9th Cir.1988); 4 COLLIER ON BANKRUPTCY ¶ 544.02 (Lawrence P. King ed., 15th ed. 1996).

■ The Bankruptcy Code looks to state law to determine the effect and validity of such liens. *McKenzie v. Irving Trust,* 323 U.S. 365, 370, 65 S.Ct. 405, 408, 89 L.Ed. 305 (1945); *Wind Power,* 841 F.2d at 293. Thus the trustee's rights in this adversary proceeding turn on whether his lien creditor status places him ahead of Chrysler Financial under California law. To determine this, we must turn to the California law on priorities.

### B. Priorities

The relative priorities of the trustee and Chrysler Financial as secured creditors in the vehicles here at issue are provided by the California U.C.C.

If the trustee and Chrysler Financial both have the status of lien creditors, as Chrysler Financial contends, their relative priorities are governed by California U.C.C. § 9312(5), which provides:

[P]riority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

CAL.COM.CODE § 9312(5) (West Supp.1996). In contrast, if Chrysler Financial's liens are unperfected, the priorities of the parties are determined under California U.C.C. § 9301(1), which states:

[A]n unperfected security interest is subordinate to the rights of all of the following:

. . . .

(b) A person who becomes a lien creditor before the security interest is perfected. CAL.COM.CODE § 9301(1) (West Supp.1996).

Pursuant to these statutory provisions, the trustee takes priority over Chrysler Financial, if Chrysler Financial's security interests are unperfected. 4 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 32–3 (4th ed.1995). In contrast, if Chrysler Financial's security interests are perfected, it has a superior priority to that of the trustee. The court thus must determine whether Chrysler Financial's security interests in the vehicles here at issue were perfected at the time that this bankruptcy case was filed. This determination turns on whether the vehicles were inventory or equipment in Babaeian's hands.

### C. Inventory vs. Equipment

Chrysler Financial contends that Babaeian held the vehicles here at issue as equipment, and not as inventory. The parties agree that the vehicles were neither consumer goods nor farm products. Whether the vehicles were equipment or inventory turns on how the debtor used the vehicles.

"Inventory" and "equipment" are both defined terms in the California U.C.C. Section 9109 provides:

Goods are

(1) "Consumer goods" if . . .

(2) "Equipment" if they are used or bought for use primarily in business (including farming or a profession) . . . or if the goods are not included in the definitions of inventory, farm products or consumer goods;

(3) "Farm products" if . . .

(4) "Inventory" if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so leased or furnished

them. . . . Inventory of a person is not to be classified as his equipment.

CAL.COM.CODE § 9109 (West 1990). These provisions are largely similar to those in the Model U.C.C. See Model U.C.C. § 9–109 (1994).

■ Under both Model U.C.C. § 9–109 and California U.C.C. § 9109, goods subject to security interests fall into four categories: consumer goods, equipment, farm products and inventory. To make sure that these categories are exhaustive, the "equipment" category is the default category: any goods not qualifying as consumer goods, farm products or inventory are classified as equipment.

■ In addition, these four categories are mutually exclusive: goods (such as the vehicles here at issue) cannot qualify as both equipment and inventory. Subsection (4) makes this explicit: "[i]nventory . . . is not to be classified as . . . equipment." In addition, the comments to the Model U.C.C. state:

The classes of goods are mutually exclusive; the same property cannot at the same time and as to the same person be both equipment and inventory, for example. In borderline cases . . . the principal use to which the property is put should be considered as determinative.

U.C.C. § 9–109 cmt. 2; *accord, Midlantic National Bank North, N.A. v. Borg–Warner Acceptance Corp. (In re Mayo),* 112 B.R. 607, 646–47 (Bankr.D.Vt.1990); *Creditway v. Phillips (In re Phillips),* 55 B.R. 663, 665 (Bankr.W.D.Va.1985); *Thrift, Inc. v. A.D.E., Inc.,* 454 N.E.2d 878, 881 (Ind.App.1983). Thus the vehicles in this case must be either equipment or inventory: they cannot be both, for the purposes of this adversary proceeding.

This controversy is vital to this adversary proceeding. If the vehicles were equipment when the bankruptcy case was filed, the trustee concedes that Chrysler Financial's perfection of its security interests is adequate, and that it has priority over the trustee's interests. If the vehicles were inventory, on the other hand, the trustee argues that Chrysler Financial's security interests were unperfected on that date, and that the trustee takes priority.

### D. Perfection of Security Interests in Vehicles

■ California statutes provide two different methods for perfecting a security interest in a vehicle. If the vehicle is inventory, perfection may only be accomplished by filing a UCC–1 financing statement in the office of the Secretary of State. In all other cases, a security interest may be perfected only by obtaining a certificate of ownership for the vehicle showing the secured party as the legal owner.

■ Thus this case involves the intersection between two comprehensive statutory systems. Division 9[6] of the California U.C.C. (§ 9101–9508) "sets out a comprehensive scheme for the regulation of security interests in personal property and fixtures." CAL.COM.CODE § 9101 cmt. (West 1990);[7] *T & O Mobile Homes, Inc. v. United California Bank,* 40 Cal.3d 441, 220 Cal.Rptr. 627, 627, 709 P.2d 430, 431 (1985). The rule assumes that the filing of a financing statement with the California Secretary of State will permit prospective purchasers and encumbrancers to ascertain the existence of security interests in such property by checking a centralized recording system. *T & O Mobile Homes,* 220 Cal.Rptr. at 629, 709 P.2d at 433. The U.C.C.'s perfection system for security interests, like the title recordation systems employed for real property, is based on the constructive notice resulting from recordation. *Id.*

■ In contrast, the older special scheme employed for the registration of security interests in motor vehicles relies primarily on actual notice to subsequent purchasers and encumbrancers through a certificate of ownership held by the owner and the secured party. *Id.* This "full title" system requires security interests to be listed on the statutory certificate of ownership. *Id.* A vehicle purchaser may rely on the certificate, and is not expected to check a centralized set of records to determine whether a security interest has been recorded. *Id.* California adopted this system decades before the advent of the Model U.C.C., and the system remains essentially unchanged. *Id.*

Chrysler Financial claims in this adversary proceeding that it fully perfected its security interests in each of the automobiles at issue by obtaining a properly endorsed certificate of ownership showing it as legal owner of the vehicles, as provided by the California Vehicle Code. Thereafter, Chrysler Financial contends, its security interests have been continuously perfected, and this perfection gives it priority over the interests of the trustee.

The trustee contends, in contrast, that the vehicles were inventory in the hands of the debtor, and that perfection of a security interest in inventory (including vehicles) requires the filing of a UCC–1 financing statement with the California Secretary of State. Because Chrysler Credit and its successor Chrysler Financial failed to make such a filing, the trustee contends that Chrysler Financial's security interests were unperfected so long as the vehicles were inventory in the hands of Babaeian, and that Chrysler Financial remained unperfected thereafter.

### 1. General Rule for Perfection

Division 9 of the California U.C.C., which derives from Article 9 of the Model U.C.C., generally governs security interests in personal property (property that is not real estate) and fixtures in California. Section 9102(1) provides:

> [T]his division applies
>
> (a) To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures. . . .

CAL.COM.CODE § 9102(1) (West 1990).

The standard procedure for perfecting a security interest in personal property under the Model U.C.C. is provided in section 9–

---

**6.** Division 9 of the California Uniform Commercial Code corresponds to Article 9 of the Uniform Commercial Code promulgated jointly by the American Law Institute and the National Conference of Commissioners on Uniform State Laws. California is well-known for its adoption of revisions to uniform laws such as the U.C.C. This case turns on one such non-uniform provision.

**7.** The Model U.C.C. has the identical commentary. *See* Model U.C.C. § 9–101 cmt. (1995).

302(1)(a): "A financing statement must be filed to perfect all security interests...." California U.C.C. § 9302(1)(a) is identical. Both the Model U.C.C. and California U.C.C. provide numerous exceptions to this rule, and Chrysler Financial claims that it qualifies under the California exception for vehicles.

## 2. Vehicle Rule

The California Vehicle Code, like all other vehicles codes, does not follow the U.C.C. general rule, except where the vehicles are inventory.

### a. General Rule for Vehicles

■ In contrast to the Model U.C.C. method of perfecting a security interest, a security interest in a vehicle is generally perfected by obtaining the original certificate of title or "pink slip" for the vehicle,[8] after the Department of Motor Vehicles has listed the creditor as the secured creditor of record. The California statute is typical. California Vehicle Code § 6300 provides:

> [N]o security interest in any vehicle registered under this code ... is perfected until the secured party ... has deposited with the [D]epartment [of Motor Vehicles] ... a properly endorsed certificate of ownership to the vehicle ... showing the secured party as legal owner....

CAL.VEH.CODE § 6300 (West 1987). Section 6301 specifies the consequences of the deposit[9] of the certificate of ownership as authorized in section 6300.

> When the secured party ... has deposited with the department a properly endorsed certificate of ownership showing the secured party as legal owner ... the deposit constitutes perfection of the security interest and the rights of all persons in the vehicle shall be subject to the provisions of the Uniform–Commercial Code....

CAL.VEH.CODE § 6301 (West 1987). Furthermore, section 6303 provides that this pro-

cedure is normally the exclusive method for obtaining a security interest in a vehicle:

> [T]he method provided in this chapter for perfecting a security interest on a vehicle registered under this code is exclusive, but the effect of such perfection, and the creation, attachment, priority and validity of such security interest shall be governed by the Uniform Commercial Code.

CAL.VEH.CODE § 6303 (West 1987).

■ The Model U.C.C. was drafted to take account of vehicle code provisions like those adopted in California. Model U.C.C. § 9–302(3)(b) provides an exception to the filing requirement for any specified certificate of title statute, such as that covering vehicles. California U.C.C. § 9302(3) provides the motor vehicle exception to the requirement of filing a UCC–1 statement:

> The filing of a financing statement otherwise required by this division is not necessary or effective to perfect a security interest in property subject to any of the following:
>
> .   .   .   .   .
>
> (b) The provisions of the Vehicle Code which require registration of a vehicle....

CAL.COMM.CODE § 9302(3) (West Supp.1996).

The reason behind the exception of vehicles from the U.C.C. filing system is that all states have statutes outside the U.C.C. that require that a security interest in motor vehicles be perfected by a notation on the certificate of title rather than by filing a UCC–1 financing statement. 8 HAWKLAND ET AL., UNIFORM COMMERCIAL CODE SERIES § 9–302:14 (1996).

Chrysler Financial contends that its predecessor Chrysler Credit complied with these provisions, and that it thus perfected its security interests in the vehicles here at issue. The trustee contends that, because the vehicles were inventory in Babaeian's hands, compliance with these provisions was insufficient to perfect Chrysler Credit's security

---

8. The owner of the vehicle receives a duplicate of the pink slip, and receives the original from the secured creditor after the encumbrance is paid in full.

9. Under the California statute, it is the date of deposit that controls for the perfection of a security interest, rather than the date of the appearance of the security interest on the pink slip. Thus administrative delays in issuing pink slips do not adversely affect vehicle secured creditors.

**544**

interests, and that Chrysler Financial's security interests were unperfected at the time of the bankruptcy filing.

#### b.  Inventory Exception for Vehicles

##### (i).  Model U.C.C. Provision

Model U.C.C. § 9–302(3)(b) makes an exception to the certificate of title perfection procedure for motor vehicle security interests, where the financed vehicles are held by a dealer as part of the dealer's inventory, which is typically called "floor plan" financing. The perfection of a security interest in vehicles in the hands of a dealer requires the filing of a UCC–1 statement. Model U.C.C. § 9–302(3)(b) states:

> [D]uring any period in which collateral is inventory held for sale by a person who is in the business of selling goods of that kind, the filing provisions of this Article (Part 4) apply to a security interest in that collateral created by him as debtor....

U.C.C. § 9–302(3)(b) (1994).

This provision serves two purposes. First, it would be awkward and inconvenient to require a lender to obtain certificate of title indorsements on an ever-changing inventory of several hundred vehicles as a condition of financing an automobile dealer. It would be equally burdensome on state authorities to process this large quantity of paperwork. The filing of a UCC–1 financing statement is a far more efficient way to deal with such security interests.

Second, a certificate of title is not usually issued at all for a new vehicle until the dealer sells it. Thus, there is ordinarily no pink slip on which to enter a financing indorsement for the perfection of a security interest in a new vehicle in the hands of a dealer.

Under the Model U.C.C. provision, it is clear that a lender for an automobile dealer, if it wants to perfect a security interest in automobiles, must file its UCC–1 financing statement. The official commentary to the 1972 revision to the Model U.C.C., which added this provision, states:

> [T]he certificate of title procedure does not control the perfection of inventory or "floor plan" security interests, but instead normal Code filing rules are applicable.

U.C.C. § 9–302 cmt. (1995); *accord, Louis & Diederich, Inc. v. Cambridge European Imports, Inc.,* 189 Cal.App.3d 1574, 234 Cal. Rptr. 889, 895 (6th Dist.1987); *Draper Bank & Trust Co. v. Lawson,* 675 P.2d 1174, 1177 (Utah 1983). For all vehicles except those held as inventory, however, a lien interest is perfected if it appears on the vehicle's certificate of title. *Draper,* 675 P.2d at 1177; *Armstrong v. Dakota Bank & Trust Co. (In re Knudson),* 929 F.2d 1280, 1285 (8th Cir. 1991).

##### (ii).  California Statute

We come now to the heart of this dispute. The "floor plan" exception to the perfection of vehicle security interests by indorsement on the certificate of title is broader under the California U.C.C. than it is under the Model U.C.C. The Model U.C.C. provision requires a UCC–1 filing only for "inventory held for sale by a person who is in the business of selling goods of that kind." Model U.C.C. § 9–302(b)(2) (1995).

In 1974 the California legislature adopted a similar provision: section 9302(b)(2) required a UCC–1 filing only for "inventory held by a person who is in the business of selling such vehicles or boats, or both as the case may be." This provision was already broader than the Model U.C.C., because it was not limited to property held "for sale."

In 1975 California again revised section 9–302(3)(b), to broaden the filing requirement even further. This provision now requires a UCC–1 filing for all vehicles held as inventory. The California legislature achieved this result by deleting the following language: "held by a person who is in the business of selling such vehicles or boats, or both as the case may be." The California U.C.C. now provides:

> [D]uring any period in which collateral is inventory, the filing provisions of this division (Chapter 4 (commencing with Section 9401)) apply to a security interest in that collateral.

Cal.Com.Code § 9302(3)(b) (West Supp. 1996).

Thus for vehicles, the California version of the U.C.C. broadens the category of invento-

ry, which requires a UCC–1 filing in order to perfect a security interest. Correlatively, California law narrows the category of vehicles for which a security interest can be perfected by obtaining a properly endorsed pink slip. In California the UCC–1 filing requirement applies whenever a vehicle is held as inventory, whether by a dealer or any other person, and irrespective of whether the vehicle is held for sale.

Under both the Model U.C.C. and the California U.C.C. versions of section 9–302(3)(b) (and the many other variants adopted by various states [10]), secured creditors are required to know their customers, and to know what business they are in. A secured lender is required to know whether a customer's business is such that holding a pink slip is not sufficient to perfect a security interest in a vehicle.

The California law is more demanding on secured creditors in this respect. It requires a lender not only to know whether its customer is a vehicle dealer, but also whether as a non-dealer the customer is selling, leasing or furnishing under contract of service [11] (or holding for sale, lease or furnishing under contract of service) a vehicle covered by a security interest. A lender who fails to know its customer in this respect runs the risk of perfecting its security interest improperly, and thus of being primed by a holder of a properly perfected security interest or a bankruptcy trustee.

### c. Vehicle Code § 5907

Chrysler Financial contends that California Vehicle Code § 5907 also protects its secured interests in this case. Section 5907 provides:

> A secured party who holds a security interest in a registered vehicle which constitutes inventory as defined in the Uniform Commercial Code, who has possession of the certificate of ownership issued for such vehicle ... need not make application for a transfer of registration and the Uniform

Commercial Code shall exclusively control the validity and perfection of such security interest.

CAL.VEH.CODE § 5907 (West 1987). Chrysler Financial's contention is misplaced.

■■■ Section 5907 is designed to cover used vehicles that are traded in to a dealer (or otherwise purchased by a dealer), presumably for resale. The section has two impacts upon a secured creditor. First, it excuses the secured party who has taken possession of a certificate of ownership (showing it as a secured party) from taking any further action with respect to the certificate when a vehicle is sold to a dealer or traded in for another vehicle. Section 5907 permits the lender to the prior owner to retain the certificate while awaiting resale of the vehicle to a new owner, instead of obtaining a new certificate showing the dealer as the new temporary owner. This feature of section 5907 has no application in this case, because Babaeian was the owner of the vehicles at all relevant times.

It is the second obligation that section 5907 imposes on the secured party that causes Chrysler Financial's problem. Section 5907 requires a UCC–1 filing under the California U.C.C. to protect the perfection of a security interest after a vehicle is traded in to a dealer and is held as inventory. Section 5907 does not excuse the secured creditor from complying with the filing requirements of the California U.C.C.: indeed, this is precisely the action that section 5907 requires. This provision is necessary to make the Vehicle Code consistent with the California U.C.C., which requires filing a UCC–1 financing statement for the perfection of a security interest in any motor vehicle that is held as inventory, leased to a customer, or furnished under a contract of service.

This result is apparent from comparing the language of section 5907 with that of section 6301. Section 6301, which provides for perfection under the Vehicle Code, provides:

---

**10.** The versions of section 9–302(3)(b) adopted by the various states are probably the least uniform of any U.C.C. provisions. *See* UNIF.COM.CODE § 9–302 (amended 1994), variations from official text, 3A U.L.A. 56–66 (1992) and Supp.1996 at 13–14.

**11.** "Furnishing under contract of service" is the U.C.C. language adopted to cover a fleet of cars owned by a car rental agency. *See* Model U.C.C. § 9–109 cmt. 3 (1995).

[T]he effect of such perfection, and the creation, attachment, priority and validity of such security interest shall be governed by the Uniform Commercial Code.

In contrast, section 5907 provides:

The Uniform Commercial Code shall exclusively control the validity and perfection of such security interest.

If section 5907 had contained language like that in section 6301, Chrysler Financial would have had a good argument that perfection under the Vehicle Code is sufficient. However, since section 5907 gives to the U.C.C. the control over perfection of the security interest, this section provides no assistance to Chrysler Financial.

■ Thus for inventory, section 5907 invalidates altogether the perfection of a security interest under the California Vehicle Code, and provides that the perfection of the security interest is governed instead by the California U.C.C. To perfect its security interest, Chrysler Financial was required to file its UCC–1 financing statement in compliance with the California U.C.C.

### E. Were the Vehicles Inventory?

This brings us to the crucial factual issue in this adversary proceeding. Were the vehicles here at issue inventory, or were they equipment? We must analyze separately the status of the four Schaffer vehicles, and that of the two retained by Babaeian.

### 1. Schaffer Vehicles

The exact status of the Schaffer vehicles is unclear. In his declaration he states:

In April, 1994, I left the employ of Babaeian Transportation and took the six vehicles which are the subject of Plaintiff's complaint, with me to use as my business equipment in my business.

Schaffer fails to specify the nature of his relationship with Babaeian, pursuant to which he "took" the vehicles.

The court assumes that this relationship, whatever its nature, results from a legal transaction. If Schaffer had purchased the vehicles from Babaeian, he would appear as the owner of record on the certificates of title. However, Babaeian continues to be the owner of record of the Schaffer vehicles, as shown on the title certificates.

■ Chrysler Financial contends that Schaffer is using the vehicles as business equipment, and that this use of the vehicles prevents them from being inventory. However, Schaffer's use of the vehicles is immaterial. In classifying goods as either equipment or inventory, the test is the *owner's* use of the goods. *Lebron v. Mech Financial, Inc.*, 125 B.R. 151, 152 (Bankr.W.D.Pa.1991). Thus it is the status of the vehicles as to Babaeian that is controlling.

■ To qualify as equipment, Babaeian must have been using the vehicles in the operation of its *own* business when the bankruptcy case was filed. Manifestly, Babaeian was not so using the Schaffer vehicles. Schaffer was using these vehicles in the operation of *his* business. Babaeian was in some sense lending the vehicles to Schaffer for this purpose.

Thus Babaeian's interest in the Schaffer vehicles falls squarely within the definition of inventory in California U.C.C. § 9109(4): Babaeian had in substance either leased these vehicles to Schaffer or furnished them under a contract of service. As inventory, the vehicles required a UCC–1 filing by Chrysler Financial and its predecessor to perfect their security interests.

### 2. Use by Babaeian

### 1. Schaffer Vehicles

Chrysler Financial argues that any change in use from equipment to inventory would not defeat the perfection of its security interests. Thus, if Chrysler Financial perfected its security interests in the Schaffer vehicles while Babaeian was using the vehicles as equipment before the transfer to Schaffer, Chrysler Financial argues that its perfection would not be defeated by the transfer to Schaffer at a later date.

The closest reported California case is *Mother Lode Bank v. GMAC,* 46 Cal.App.3d 807, 120 Cal.Rptr. 429 (Ct.App.1975). In *Mother Lode,* Targett Motors sold two pickup trucks to customers on conditional sales

contracts, and assigned the contracts to the bank. The bank obtained pink slips showing it as the legal owner (the status of a secured creditor under the California Vehicle Code). After default by the purchasers, the bank repossessed the pickup trucks and redelivered them to Targett for resale. Although the bank's contract with Targett provided for Targett to repurchase the contracts from the bank upon repossession of the vehicles, Targett did not do so. Meanwhile, Targett had obtained floor plan financing from GMAC. Targett represented to GMAC that it owned the vehicles (i.e., that there were no secured creditors of record), even though the bank still held legal title to each. GMAC financed the vehicles under its UCC–1 financing statement, without checking with the Department of Motor Vehicles to determine the status of title to the vehicles.

Under these circumstances, the court found that the bank retained its security interest in the vehicles, and that Targett never reacquired an interest sufficient to give a security interest to GMAC. The court reasoned that Targett did not acquire rights in the vehicles sufficient to transfer a valid security interest to GMAC, because it did not buy back the security interests from the bank. *Id.* 120 Cal.Rptr. at 433. Thus the bank's security interests took priority over those of GMAC.

*Mother Lode* provides no help to Chrysler Financial in this case, because the California legislature changed the statute after *Mother Lode* was decided. The facts in *Mother Lode* arose in 1972, when California U.C.C. § 9302 provided:

> (3) The filing provisions of this division do not apply to a security interest
>
> . . . .
>
> (b) In a vehicle . . . required to be registered under the Vehicle Code, unless such vehicle . . . is inventory. . . .
>
> (4) . . . A security interest in a vehicle . . . required to be registered under the Vehicle Code which is not inventory may be perfected only as provided in the Vehicle Code.

■ The subsequent changes to section 9302(3)(b) changed the filing requirements "during any period in which collateral is inventory." This "during any period" language contemplates that collateral may be equipment (or consumer goods or farm products) for a period of time, during which perfection under the Vehicle Code is required and effective. However, if in a subsequent period the goods become inventory, section 9302(3)(b) now requires that the perfection of a security interest during that period of time be accomplished by filing pursuant to section 9401. Perfection under the Vehicle Code is no longer effective during this period of time.

This statutory change dictates the result for the Schaffer vehicles. In the opinion of this court, the change legislatively overruled the court decision in *Mother Lode*. During the period of time that Babaeian leased the vehicles here at issue (including both the Schaffer vehicles and the other two vehicles) to its drivers, or held the vehicles for such lease, they were inventory under the section 9109(4) definition. During this period of time, Chrysler Financial could only perfect its security interests by filing its UCC–1 statement with the Secretary of State, which it failed to do. This filing requirement applied, even though Babaeian was not a vehicle dealer, because the non-uniform language in California U.C.C. § 9109 made the vehicles inventory in Babaeian's hands after the transfer.

Chrysler Financial also relies upon *Robert Bogetti & Sons v. Bank of America (In re Robert Bogetti & Sons)*, 162 B.R. 289 (Bankr. E.D.Ca.1993), in support of its position. The bankruptcy court in *Bogetti* held that, where a bank properly filed its UCC–1 statement to perfect a security interest in crops and farm products, the bank did not become unsecured when the bean crop at issue subsequently became inventory. The court based this holding on California U.C.C. § 9401(3), which provides:

> A filing which is made in the proper place in this state continues effective even though the debtor's residence or place of business or the location of the collateral or its use, whichever controlled the original filing, is thereafter changed.

CAL.COM.CODE § 9401(3) (West 1990). In *Bogetti* the bank always had a properly filed

UCC–1, which covered the bean crop so long as it constituted crops and farm products. However, the description of its collateral arguably no longer covered the beans when they became inventory (held for sale), rather than crops and farm products. The court in *Bogetti* found that this was a use change within the meaning of section 9401(3), which protected the bank's perfection of its security interest.

Even if Chrysler Financial had validly perfected its security interests in the vehicles, it could not prevail under section 9401(3). The general provision of section 9401(3) is preempted by the more specific provision of section 9302(3)(b). CAL.CIV.CODE § 3534 (West 1970) ("Particular expressions qualify those which are general"); *Trustees of Amalgamated Insurance v. Geltman Industries*, 784 F.2d 926, 929 (9th Cir.1986) (same).

Under the more specific provision relating solely to vehicles, Chrysler Financial was required to file its UCC–1 financing statement under the California U.C.C. "during any period in which the collateral is inventory." Thus *Bogetti* provides no assistance to Chrysler Financial.

Furthermore, this case differs from *Bogetti* for the reasons stated in the next section: Chrysler Credit and Chrysler Financial never validly perfected their security interests in the vehicles here at issue. There is no evidence that Babaeian ever used the vehicles for any purpose other than leasing them to its taxi drivers. In the absence of a properly perfected security interest at the outset (or at some time prior to the filing of the bankruptcy case), section 9401(3) and *Bogetti* provide no assistance to Chrysler Financial.

Chrysler Financial also cites in support of its position *Commercial Credit Equip. Corp. v. Carter*, 83 Wash.2d 136, 516 P.2d 767 (1973); *In re Barnes*, 11 U.C.C.Rep.Serv. (CBC) 670, 1972 WL 20780 (Bankr.D.Me. 1972); and *In re Morton*, 9 U.C.C.Rep.Serv. (CBC) 1147, 1971 WL 17924 (Bankr.D.Me. 1972). None of these cases supports its position. Each was decided on the pre–1972 version of the U.C.C., before the "during any period" provision was added to the Model U.C.C. (and to the California version thereof).[12] Washington amended its U.C.C. to add the "during any period" language in 1977, and Maine amended its U.C.C. to add this language effective in 1978.

As to the Schaffer vehicles, the court finds these cases irrelevant, because the subsequent transfer of possession of the vehicles to Schaffer made them inventory in Babaeian's hands, which required a UCC–1 filing because of California's non-uniform definition of inventory.

## 2. Vehicles in Babaeian's Possession

Chrysler Financial argues that all six vehicles were equipment while they were in Babaeian's hands. It challenges the form of the arrangement that Babaeian had with its drivers, and contends that in substance they were employees driving vehicles belonging to Babaeian. If the vehicles were operated by employees, Chrysler Financial argues, they were not leased or held for lease and did not qualify as inventory.

It is undisputed that in form Babaeian principally conducted its business by leasing vehicles to drivers to operate as taxis in the communities where Babaeian was licensed to conduct business.[13] The drivers paid Babaeian fixed lease payments of $500 to $600 per week. The lease payments did not vary with the amount of fares that the drivers collected. If the drivers collected more than the lease payments (which presumably they usually did, or they would not have made a living

---

**12.** There are post–1972 cases stating as the generally accepted rule that the relevant time to classify collateral for determining the requirement and consequences of perfection is the time surrounding the transaction giving rise to the security interest. *See, e.g., Amvest Funding Co. v. Rex Group, Inc. (In re Rex Group, Inc.)*, 80 B.R. 774, 781 (Bankr.E.D.Va.1987). It is also said that the debtor's stated intended use, at the time of attachment of the security interest, defines the nature of the goods for the purpose of determin-

ing how to perfect a security interest in them. *Id., Beacon Light*, 125 B.R. 154, 157 (Bankr. W.D.Va.1990). However, these opinions fail to take into account the 1972 change in language in U.C.C. § 9–302(3)(b), which has subsequently been adopted by most states.

**13.** Some of the drivers for Babaeian owned their own vehicles. None of these vehicles are at issue in this litigation.

at the job), they were entitled to keep all of the excess; if they collected less, they still owed the fixed payments every week.

Chrysler Financial cites several cases holding that purported lease/independent contractor contracts with taxicab drivers are in substance employment contracts, and that in consequence the vehicles here at issue were equipment in the hands of Babaeian. *See, e.g., City Cab Co. of Orlando, Inc. v. NLRB,* 628 F.2d 261 (D.C.Cir.1980); *Santa Cruz Transp., Inc. v. Unemployment Ins. App. Bd.,* 235 Cal.App.3d 1363, 1 Cal.Rptr.2d 64 (1991); *Yellow Cab Cooperative, Inc. v. WCAB,* 226 Cal.App.3d 1288, 277 Cal.Rptr. 434 (1991).

However, none of these cases involves the perfection of a security interest in vehicles used as taxicabs. *City Cab* was a review of a National Labor Relations Board order requiring the taxicab company to bargain collectively with its cabdrivers. *Santa Cruz Transportation* considered whether a taxicab driver was entitled to increased disability benefits under the unemployment insurance law. *Yellow Cab Cooperative* was a review of a Workers Compensation Appeals Board determination that an injured driver was entitled to workers' compensation after injury on the job. Each of these cases involved the relationship between the taxicab company and its drivers.

■ The court does not find these cases helpful on the issue of the perfection of a security interest in a taxicab vehicle. The drivers may have the legal status of employees for some purposes, and be considered lessees for other purposes. In *Santa Cruz Transportation* the court made clear the limited extent of the California case law: it stated that its analysis applied "[u]nder the Unemployment Insurance Code and as relevant to this case...." *Santa Cruz Transportation,* 1 Cal.Rptr.2d at 67. Further-

more, it stated that *Yellow Cab* considered only to whether the cabdriver was an employee for workers' compensation purposes under the facts of the case. *Id.* at 69–70.

Based on the undisputed evidence before the court in this case, the court concludes that on balance it must accept the form of the relationships with the taxi drivers as structured by Babaeian. Even if they were employees for many purposes, they could also be lessees as to the vehicles.

The court finds that, so long as Babaeian held the vehicles, they were leased to the drivers, or held for such lease. It follows that in Babaeian's hands the vehicles were inventory, and not equipment.

## F. Sales Contract Provisions

Chrysler Financial further argues that it perfected its security interests based on the intended use of the vehicles, as stated in the agreements between it and the debtor.[14] The court finds this argument unavailing.

■ Chrysler Financial has the burden of proof on the perfection of its security interests. The court points this out because the record is notably lacking in evidence as to what the parties to the sales contracts intended. Only the bare contracts are before the court: neither side has presented any evidence on knowledge or intent from anyone who was present at the negotiations. Where evidence is lacking, Chrysler Financial must bear the adverse inference.

Chrysler Financial points to paragraph B of the "Additional Terms and Agreements" on the back side of the sales agreement,[15] which provides in part:

USE OF VEHICLE: You agree ... not to use the vehicle—or permit the vehicle to be used illegally, improperly, or for hire, or to expose the vehicle to misuse or confiscation.[16]

largely regulated in California by statute. *See* Reese–Levering Motor Vehicle Sales and Finance Act, codified in Cal.Civ.Code § 2981–2984.4 (West 1993 & Supp.1996).

---

**14.** Chrysler Financial presumably stands in the shoes of Glendale Dodge in this case. Chrysler Financial has made no argument that it enjoys any better rights than Glendale Dodge would have enjoyed had it not sold the secured commercial paper to Chrysler Credit.

**15.** The provisions on the front side of a motor vehicle purchase and finance agreement are

**16.** The size of type here matches the six-point type in the sales document.

This language is part of a much longer paragraph on the back side of the sales agreement. The entire back side is printed in six point type, the smallest size permitted under California statute. *See* CAL.CIV.CODE § 2981.9 (West 1993).

There is no evidence that either the buyer or the seller paid any attention to this (or any other) language on the back of the document when the debtor purchased the vehicles. Mr. Puri likely knew the nature of the debtor's business, given that he sold the debtor six similar automobiles during a period of six months, and the debtor's name indicated that it was in the "transportation" business. There is no evidence that Glendale Dodge had any other automobile sales form, or that any form other than this one was available for the purchase of a vehicle for use as a taxicab.

To determine the meaning and interpretation of the "to hire" language, it is necessary to examine it in its context. There are eight paragraphs on the back of the form, that constitute the additional terms and agreements. These paragraphs provide for the grant of a security interest, insurance obligations of the buyer, prepayment rights, rights upon default, seller and buyer warranties, rescission rights, a power of attorney, and other miscellaneous agreements.

In this context, the function of paragraph B is to require the buyer to maintain the vehicle in proper condition and not to use it in ways that would fall outside standard insurance coverage, and thus subject the lender to an uninsured loss. The language is not designed to prevent the vehicle from becoming inventory, and thus to require a UCC–1 filing to perfect a security interest. There is no language in paragraph B, with the possible exception of the "for hire" words that is even relevant to such a problem.

The court further finds that this language does not disclose the intended use of the vehicles. Automobiles are put to a variety of uses. If Glendale Dodge had wanted to collect information on its customers' intended uses (for whatever purposes), it would not have put it in boilerplate language on the back of the contract, where there is no place to choose among a variety of intended uses, and where it may be overlooked altogether.

In addition, Chrysler Financial's argument proves too little. The language in paragraph B was much too narrow to rely upon to avoid the need to file a UCC–1 statement to perfect its security interest. Babaeian could have engaged in other businesses in which the vehicles constituted inventory, and Chrysler Financial would have been required to file a UCC–1 statement to perfect a security interest. If Babaeian had been in the business of leasing vehicles to corporations for use in their business, or to the public for personal use (such as Hertz or Avis), there clearly would have been no violation of the "for hire" provision, but Chrysler Financial would have had to file a UCC–1 statement to perfect its security interests.

Chrysler Financial notably ignores much more direct evidence on what both parties to the contracts considered the intended use of the vehicles. The front of each of the sales documents has a line that states:

> Vehicle Use: ☐ Personal, Family or Household ☐ Commercial or Agricultural [17]

Insofar as the parties intended to specify the intended use of the vehicles, this was the place to express this intent. In three of the documents, the second box, for commercial or agricultural use, is checked, and in the other three neither box is checked. Insofar as the sales contracts disclosed an intended use for the vehicles, the court finds that this was the place to disclose this intention. The court further finds that, insofar as such an intention is disclosed, it is consistent with the actual usage to which Babaeian put the vehicles.

This provides further evidence that Glendale Dodge, and Chrysler Financial as its successor, were put on notice that indorsement on a pink slip may not be sufficient to perfect a security in interest in the vehicles here at issue.

The court holds that the language on the back of the contract form cited by Chrysler Financial is not probative as to the intended use of the vehicles, in any sense relevant to

---

**17.** The size of type here matches that in the sales document.

this litigation. This language did not disclose any intended use, on which Chrysler Financial or its predecessors were entitled to rely in determining whether they needed to file a UCC–1 financing statement to perfect their security interests.

## IV. CONCLUSION

The court concludes that Babaeian held the vehicles here at issue as inventory at all relevant times. The non-uniform California definition of inventory in the California U.C.C. imposes a UCC–1 filing requirement whenever vehicles are held as inventory by any owner, and is not limited (like the Model U.C.C.) to vehicles held for sale by vehicle dealers. Thus Chrysler Financial could only perfect its security interests in the vehicles by filing a UCC–1 financing statement with the California Secretary of State. Chrysler Financial's obtaining a pink slip for each of them showing it as the legal owner did not meet the statutory requirements for perfection, and its security interests were unperfected. As a hypothetical lien creditor, the trustee thus takes priority over Chrysler Financial, and Chrysler Financial's security interest is avoided and its claim is unsecured.

It is important to note that this is a dispute between innocent third parties, and not between Babaeian and Chrysler Financial. The trustee stands in the shoes of unsecured creditors, innocent parties who never dealt with Chrysler Financial. In this controversy, it is Chrysler Financial and its predecessor Chrysler Credit that failed to satisfy the statutory requirements for perfection. Chrysler Financial is the one that should have kept better track of its collateral. Perhaps it should have obtained better information from Glendale Dodge, its assignor, who most likely knew the use for which the vehicles were intended. As between Chrysler Financial and the unsecured creditors, the equities clearly fall on the side of the unsecured creditors. So does the law.